478 F.2d 203
 UNITED STATES of America ex rel. George HART, Appellant,
v.
Frank DAVENPORT, Sheriff of the State of New Jersey of
Passaic County, and Howard D. Yeager, Warden, New
Jersey Prison.
 No. 72-1287.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 19, 1972.
Submitted Jan. 31, 1973.
Decided April 27, 1973.
 
 Stanley C. Van Ness, Public Defender, Herbert I. Waldman, Newark, N. J., for appellant.
 Joseph D. J. Gourley, Passaic County Prosecutor, John P. Goceljak, Paterson, N. J., for appellee.
 Argued Oct. 19, 1972.
 Before STALEY, GIBBONS and ROSEN,* Circuit Judges.
 Submitted on Briefs Jan. 31, 1973.
 Before STALEY, ALDISERT and GIBBONS, Circuit Judges.
 OPINION OF THE COURT
 GIBBONS, Circuit Judge.
 
 
 1
 This is an appeal from the denial of a petition for habeas corpus challenging a New Jersey sentence. Appellant Hart was convicted of unlawful possession of lottery slips, N.J.Stat.Ann. Sec. 2A:121-3(b), working for a lottery operation, N.J.Stat.Ann. Sec. 2A:121-3(a), and bookmaking, N.J.Stat.Ann. Sec. 2A:112-3. The district court denied the petition on the basis of the State court record, without an evidentiary hearing, but, pursuant to 28 U.S.C. Sec. 2253, granted a certificate of probable cause for appeal. Two issues, as to both of which State remedies have been exhausted, are raised by the petition. Hart contends, first, that he was deprived of the effective assistance of counsel in his criminal trial because in that trial a single defense attorney, retained by his codefendant employers, represented him, the two employers, and three other codefendants. His second contention is that in the criminal trial the State introduced evidence obtained in violation of the fourth amendment. Since no timely motion to suppress was made on his behalf, the second contention is closely related to the effective assistance of counsel argument.
 
 
 2
 Hart and five others were indicted for gambling offenses alleged to have been committed at Whitey's Bar and Grill in Paterson. That business was owned by the codefendants John and Grace Battersby. Hart was employed by them as a bartender. The Battersbys lived in an apartment above the business premise. Hart and the Battersbys were charged with maintaining a gambling resort, N. J.Stat.Ann. Sec. 2A:112-3, bookmaking, N. J.Stat.Ann. Sec. 2A:112-3, possession of lottery slips, N.J.Stat.Ann. Sec. 2A:121-3(b), and working for a lottery, N.J. Stat.Ann. Sec. 2A:121-3(a). Three patrons of the bar, Wolcott, Stewart, and Chambliss, were charged with possession of lottery slips. All six were represented by the same retained attorney and were tried together. No pretrial motions for severance or for suppression of evidence were made on behalf of any defendant. The record discloses no inquiry from the State trial court either to counsel or to the defendants as to any possible conflict of interest among the defendants. See Government of the Virgin Islands v. Hernandez, 476 F.2d 791 (3d Cir., 1973); Government of the Virgin Islands v. John, 447 F.2d 69, 74-75 (3d Cir. 1971).
 
 
 3
 At the end of the State's case it consented to the dismissal of the charge that Hart had maintained a gambling resort. N.J.Stat.Ann. Sec. 2A:112-3. All other charges went to the jury. In the defense case Wolcott, Stewart, Chambliss, and John Battersby took the stand. Hart and Mrs. Battersby did not. Wolcott and Stewart were acquitted. Chambliss was convicted of possession of lottery slips, but did not appeal. The Battersbys and Hart were convicted on all counts except the one charge against Hart which had been dismissed. Following the conviction Hart arranged for separate representation by the New Jersey Public Defender. An appeal on his behalf raising the same issues presented here resulted in an affirmance by the Appellate Division. State v. Hart, No. A-935-69 (N.J.Super., App.Div., Mar. 26, 1971). The New Jersey Supreme Court denied certification. State v. Hart, 58 N.J. 339, 277 A.2d 396 (1971). A separate appeal by the Battersbys resulted in an affirmance, and the denial of certification. State v. Battersby, 57 N.J. 140, 270 A.2d 42 (1970).
 
 
 4
 The indictments were the result of a raid conducted by the anti-gambling squad of the Paterson Police Department on March 18, 1969, in execution of a search warrant. Hart asserted on appeal that despite the failure of the common counsel to make a suppression motion admission of evidence seized in the raid should have been noticed as plain error. In rejecting this contention the Appellate Division, quoting from the disposition of the Battersbys' appeal, State v. Battersby, No. A-891-69 (N.J. Super., App.Div., July 2, 1970), said:
 
 
 5
 "This point lacks substantial merit. This is not a situation where a defendant may have suffered a manifest denial of justice by reason of some palpably inept performance by an assigned attorney. The present case involves a hind-sight attack upon the professional handling of the defense by an attorney of one's own choosing. There is nothing in the record to support the conclusion that a pretrial motion to suppress the incriminating evidence found upon defendants' premises by the police in their execution of a search warrant, obtained upon the basis of a supporting affidavit, would have been granted."
 
 
 6
 There was in the record, however, the affidavit upon which the search warrant issued, which in relevant part reads:
 
 
 7
 "3. That the facts tending to establish the ground for this application and the probable cause of my belief as aforesaid, are as follows:
 
 
 8
 Tues. March 11, 1969 received from a confidtential informant, information regarding taveren in question that there was a bartender by the name of George taking horse and number action in the taveren and turning it over to owner who reside upstairs over the taveren with his wife.
 
 
 9
 Tues. 10:45 A.M. till 1:35 P.M. stood in area of taveren and went in there for lunch and then returned to office. All the time this date I observed from my private car eleven men run in and run right out none of above stood in for any legth of time. Plus when I was in ther having lunch I observed two men come into establishment and talk to George and then he went upstairs at which time owners wife was downstairs with patrons. On this date I was in taveren from 12:p.m. till 12:50 p.m. the rest of time I spent riding around watching traffinto taveren and out.
 
 
 10
 3-13-69 Thurs.
 
 
 11
 I det. Tribio Verrone again took up a vantage point where I could not be detected from 11:30 till 3 P.M. and watched to see traffic into taveren At 12:p.m. I observed two railroad men after eating there lunch walk over two the taveren at which time I went in right behind them one man order a beer but the other went to George and had the Daily [N]ews in his hand I could see them in plain sight but at no time did this man give him a slip of paper he just talked to him and the went upstairs. Leading me to believe information recieved that owner is stationed upstairs taking action on horses I left after having lunch and several other men came into taveren and talk to [G]eorge but on this occasion thrre men came in but he didn't go right upstairs until the third man was done with him but at no time did I see him write anything down just talk with the patrons and then go upstairs.
 
 
 12
 3-13-69 I again contacted my informant to see if he could make a bet with [G]eorge but he told me he won't take any slips refering to George he runs upstairs when he has all he can remember, only off of his steady customers does he take slips.
 
 
 13
 3-17-69 Mon. I Det. Tribio Verrone again went into taveren on this date and had a few beers it was this time [I] heard phone ring it was approx. 11:35 a.m. [G]eorge went over to phone and spoke with someone for a minuet take care of things for me till I come back.
 
 
 14
 He returned shortly only when he came back down he was carring Daily [N]ews. On this date while [I] was in the taveren I again seen one of eleven men I had seen another day come into taveren he went directly to [G]eorge talke with him and then they both went upstairs and a old woman came down approx. five minuets went by and down came both [G]eorge and other gentleman and he left never havin a drink. It is in my belief that [G]eorge is taking the bets upstair to whoever is there which my informant says is the owner of the taveren, It is my belief that a search warrant should be issued so this investigation can be brought to a close." [sic].
 
 
 15
 This affidavit is palpably insufficient to support the issuance of the search warrant. The informant information is totally inadequate to establish his reliability. Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). The affiant's observations could have been made at noon outside and inside any bar and grill. They do not, independent of the informant's conclusions, establish probable cause. Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). The activities of "George" referred to are as consistent with innocent conduct as with bookmaking or maintaining a lottery. The district court opinion acknowledges as much, but sustains the seizure on other grounds:
 
 
 16
 "[I]f the legal sufficiency of the warrant were to be tested solely by the adequacy of the informant allegation, the Court feels the validity of the warrant could not be sustained. But a finding of probable cause must take into consideration the facts recited by Detective Verrone relating his personal observation of activities occurring at Whitey's Bar and Grill on three separate occasions. The conclusion is reached that the seizure of evidence was not conducted in violation of petitioner's Fourth Amendment rights. Thus the failure of counsel to move to suppress does not constitute ineffective representation of petitioner at trial." United States ex rel. Hart v. Davenport, Civil No. 645-71 (D.N.J., Mar. 30, 1972).
 
 
 17
 The testimony of Detective Verrone referred to by the district court is testimony at trial, not testimony before the magistrate who issued the warrant. Compare this situation with that in United States ex rel. Gaugler v. Brierley, 477 F.2d 516 (3d Cir., 1973). Thus, the district court ruled that although the warrant was issued on the basis of a defective affidavit a suppression motion would not have been successful because a warrantless seizure would in the circumstances have been proper.
 
 
 18
 This ruling must be considered in light of the various charges and the different positions of the several defendants. There was no conspiracy charge. There are substantive differences between the offense of bookmaking, N.J. Stat.Ann. Sec. 2A:112-3, and the lottery offenses proscribed by N.J.Stat.Ann. Sec. 2A:121-3. The former is the making or taking and recording or registering of bets or wagers on races and other sporting contests. State v. Romeo, 43 N.J. 188, 207, 203 A.2d 23, 33 (1964), cert. denied, 379 U.S. 970, 85 S.Ct. 668, 13 L. Ed.2d 563 (1965). The latter statute defines as separate offenses possession of lottery slips, N.J.Stat.Ann. Sec. 2A:121-3(b), working for a lottery operator, N.J.Stat.Ann. Sec. 2A:121-3(a), and being the owner of a building or place where any business of lottery or policy is carried on knowingly by the owner or an agency, N.J.Stat.Ann. Sec. 2A:121-3(c). Hart was convicted of bookmaking, of possession of lottery slips, and of working for a lottery operator. As the State conceded at the end of its case, Hart, although so charged, not being the owner of the premises could not be convicted of an offense involving ownership of the premises. Some of the seized evidence tended to prove only lottery violations. Some of it tended to prove only bookmaking. The common attorney made no effort to differentiate when commenting on the evidence and requested no limiting instructions. Detective Verrone testified that on March 11, 13 and 17, he observed what he described as patrons writing out bets on paper and handing the paper either to Mrs. Battersby or to Hart. He made no arrest on these dates, and he did not include the details of his observation in an affidavit in support of an application for a search warrant or an arrest warrant. The arrests were made on March 18. If the seizures were to be sustained as incident to a lawful arrest a matter never considered by the State courts, they would have to be made because the officer had reasonable cause to believe an offense was being committed in his presence on that date. Beck v. Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L. Ed.2d 142 (1964). Indeed, the trial court ruled (Tr. 29) that Verrone's testimony about activities prior to March 18 could not be considered by the jury because on cross examination he conceded that his reference to bets on these days was pure conjecture. On March 18, when the arrests were made, Mrs. Battersby and the three patrons, Wolcott, Stewart and Chambliss, were in the bar and grill. Hart was not present. He had left and gone upstairs to the Battersbys' apartment. Since no conspiracy was alleged, the seized evidence of betting activity would have to be connected to individual defendants in some way. Some such evidence was seized in the bar. An obvious defense strategy for Hart was to attribute origin and possession of that evidence to Mrs. Battersby, who according to the testimony attempted to conceal some betting slips in the garbage can. (Tr. 41-43). This strategy was not effectively pursued. Indeed, no limiting instruction as to the use of the evidence seized in the bar and grill while Hart was not present was even requested. The absence of such a request, which would, of course, have tended to focus the attention of the jury on Mrs. Battersby's role, points up the conflicting position of counsel. The same is true of certain evidence seized from the patron defendants while Hart was upstairs.
 
 
 19
 Almost immediately after the arrests were made in the bar and grill two detectives went upstairs and knocked on the apartment door. Hart, who had a phone in his hand, opened the door. A search of the apartment was conducted. In a room remote from that in which Hart was using the phone, described as an office, the officers seized a suitcase, Exhibit S-9, containing money and a horse sheet and slips containing horse bets. From a dresser drawer in the bedroom in which Hart was using the phone, the officers seized a notebook, Exhibit S-10, allegedly gambling paraphernalia. Battersby was sleeping in the apartment, which undisputably belonged to him and Mrs. Battersby. No objection was made to the admission of the evidence seized in the apartment and no limiting instruction was requested on Hart's behalf. Officer Verrone was the only officer who made any significant observations on March 18 prior to the arrests. His observations, all in the bar and grill, were probably insufficient to justify a warrantless arrest of Hart upstairs in the apartment. Battersby, however, was known to be one of the proprietors of the bar and grill. Verrone's observations might have been sufficient to justify Battersby's arrest for a violation of N.J.Stat.Ann. Sec. 2A:112-3,[1] and the seizures in the apartment might possibly have been justified as incident to his arrest. But neither the apartment nor the bar and grill belong to Hart, and there is no evidence of Hart's possession of Exhibits S-9 and S-10. See United States v. Bonham, 477 F.2d 1137 (3d Cir., 1973). Another exhibit, S-15, was seized from Hart's person, but that seizure, had objection been made, should properly have been suppressed since there was no probable cause to arrest Hart. Here, again, the predicament of counsel becomes clear, for any effort to negate Hart's connection with Exhibits S-9 and S-10 would have the inevitable tendency to focus attention on Battersby's role as a proprietor of a gambling enterprise as well as a bar and grill.
 
 
 20
 In his opening statement to the jury the defense attorney made this short reference to Hart:
 
 
 21
 "[Mrs. Battersby] had gone behind the bar to relieve Mr. Hart, who was a bartender. Mr. Hart had at that time gone to the upstairs apartment to call his wife or to call his veterinarian about the dog that he owned that was confined at the veterinarian's place of business and he was concerned about its well being. The State contends that he was phoning in numbers or phoning in bets of some sort. This I will have to wait and see how they are going to show that." (Tr. of Openings, 11).
 
 
 22
 Hart contends the veterinarian to whom he was talking at the time of his arrest was available to verify that he was not phoning in bets, but that the common defense attorney did not call him. He complains, as well, that whereas the patron defendants and Battersby took the stand, he was not called to support the representation counsel had made to the jury in the opening statement. Finally he contends, and the record bears him out, that the common defense attorney made no attempt, in his closing argument, to differentiate Hart's position from that of his codefendants.
 
 
 23
 The absence of a meaningful closing argument on Hart's behalf again illustrates the dilemma of counsel. There was testimony of an admission by Battersby that they were in this gambling business because the tavern business was not so good and they needed the money. (Tr. 135, 148). An obvious defense strategy for Hart was to emphasize this testimony in an attempt to convince the jury that Mr. and Mrs. Battersby were the sole proprietors not only of the bar and grill but also of the gambling enterprise. Instead, the strategy adopted was to deny the admission. (Tr. of Summations, 20).
 
 
 24
 The record of the State proceedings, then, establishes that there were among the defendants in the trial conflicting interests. The record is silent as to any advice to Hart respecting those conflicting interests by counsel, by the prosecutor, or by the court. Moreover, in a case of this type, particularly, a conflict arises long before the trial. That conflict is referred to in Justice Weintraub's opinion in In re Abrams, 56 N.J. 271, 266 A.2d 275 (1970). Abrams is a disciplinary proceeding against an attorney for undertaking at the behest and expense of an employer in a gambling enterprise the representation of an underling employee. That is precisely what the attorney did in this case for it is not disputed that the Battersbys, the employers, retained and paid the common attorney. In Abrams Justice Weintraub wrote:
 
 
 25
 "But, accepting the premise that respondent had no prior commitment to Pickett's organization, we nonetheless think it was improper for respondent to have accepted the organization's promise to pay his bill, for such an arrangement has the inherent risk of dividing an attorney's loyalty between the defendant and the gambler-employer who will pay for the services. Obviously, it is to the interest of the defendant's employer that the defendant shall not turn him in. That is why the employer is willing to pay. As the Pennsylvania Supreme Court said in Salus [In re Salus], supra [321 Pa. 106] 184 A. at 71:
 
 
 26
 '* * * It is the latter [the bankers of the syndicates] who are anxious to protect the numbers writers so that they will have no cause for dissatisfaction and no occasion to disclose the operations of the system or the identity of parties by whom they are engaged.' It is of course to the advantage of the convicted defendant to seek leniency by aiding the State in its pursuit of his employer. State v. DeStasio, 49 N.J. 247, 256-258 [229 A.2d 636] (1967), cert. denied, 389 U. S. 830, 88 S.Ct. 96, 19 L.Ed.2d 89 (1967). It is the duty of the defendant's attorney to advise him of that opportunity. An attorney is hardly well situated to discharge that duty when he has agreed to look to the syndicate for the payment of his fee.
 
 
 27
 A conflict of interest inheres in every such situation. It is no answer that Canon 6 of the Canons of Professional Ethics permits the representation of conflicting interest 'by express consent of all concerned given after a full disclosure of the facts,' or that Canon 38, restated in affirmative terms, would permit the acceptance of compensation from others with 'the knowledge and consent of his client after full disclosure.' Neither rule is relevant when the subject matter is crime and when the public interest in the disclosure of criminal activities might thereby be hindered. It is inherently wrong to represent both the employer and the employee if the employee's interest may, and the public interest will, be advanced by the employee's disclosure of his employer's criminal conduct." 56 N.J. at 275-276, 266 A.2d at 278.
 
 
 28
 The legal standard to be applied to a claim of prejudice from joint representation is clear enough. The right to counsel guaranteed by the sixth and fourteenth amendments contemplates the service of an attorney devoted solely to the interests of his client. The right to such untrammelled and unimpaired assistance applies both prior to trial in considering how to plead, Von Moltke v. Gillies, 332 U.S. 708, 68 S.Ct. 316, 92 L.Ed. 309 (1948), and during trial, Glasser v. United States, 315 U.S. 60, 70, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Recognizing that the right to such assistance of counsel may be waived, e.g., Adams v. United States ex rel. McCann, 317 U.S. 269, 275, 63 S.Ct. 236, 87 L.Ed. 268 (1942), we have refused to find any such waiver from a silent record. Government of the Virgin Islands v. Hernandez, supra; Government of the Virgin Islands v. John, supra. We have not yet held that the coincidence of joint representation and a silent record is alone enough to require relief. But see Campbell v. United States, 122 U.S.App.D.C. 143, 352 F.2d 359 (1965). On the other hand, we have rejected the approach that before relief will be considered the defendant must show some specific instance of prejudice. But see United States v. Lovano, 420 F.2d 769, 773 (2d Cir.), cert. denied, 397 U.S. 1071, 90 S.Ct. 1515, 25 L.Ed.2d 694 (1970); United States v. Alberti, 470 F.2d 878, 882 (2d Cir. 1972). Instead, we have held that upon a showing of a possible conflict of interest or prejudice, however remote, we will regard joint representation as constitutionally defective. Walker v. United States, 422 F.2d 374 (3d Cir.), cert. denied, 399 U. S. 915, 90 S.Ct. 2219, 26 L.Ed.2d 573 (1970). Cf. United States v. Rispo, 460 F.2d 965, 970 (3d Cir. 1972); United States ex rel. Small v. Rundle, 442 F.2d 235, 238 (3d Cir. 1971). The Walker test of possible conflict of interest or prejudice however remote, must be applied, moreover, in light of the normal competency standard for adequacy of representation by counsel adopted in this circuit. United States ex rel. Green v. Rundle, 434 F.2d 1112 (3d Cir. 1970); Moore v. United States, 432 F.2d 730 (3d Cir. 1970). Normal competency includes, we think, such adherence to ethical standards with respect to avoidance of conflicting interests as is generally expected from the bar.
 
 
 29
 This, being so, Justice Weintraub's opinion in the Abrams case should alone suffice to establish Hart's claim that he was tried without the effective assistance of counsel. But we need hardly rest our decision on the Abrams case alone, since on the present record the Walker test-a showing of a possible conflict of interest or prejudice, however remote-clearly has been met. And this test is applicable to state proceedings, United States ex rel. Small v. Rundle, supra, just as the Moore standard on adequacy of representation is, United States ex rel. Green v. Rundle, supra.
 
 
 30
 There remains the final contention that because the attorney was privately retained his actions in rendering ineffective assistance should not be attributed, for fourteenth amendment purposes, to the State of New Jersey. See, e.g., United States ex rel. Wilkins v. Banmiller, 205 F.Supp. 123 (E.D.Pa. 1962), aff'd, 325 F.2d 514 (3d Cir. 1963), cert. denied, 379 U.S. 847, 85 S. Ct. 87, 13 L.Ed.2d 51 (1964). Cf. United States ex rel. O'Brien v. Maroney, 423 F.2d 865 (3d Cir. 1970). This contention argues too much. We have never indicated that the hand of the fourteenth amendment is stayed in every case where a defendant is represented by private counsel. What we have previously said is that actions of a privately retained attorney do not for fourteenth amendment purposes per se involve state action. Where the questioned conduct of such attorney takes place in the presence of the court or the state attorney, the state action basis for vindication of the alleged fourteenth amendment deprivation is the failure of the state prosecutor or state court to take necessary corrective action. Thus, in Wilkins and O'Brien, there was no proof that the state's attorney or court had knowledge of the alleged deprivation. As early as United States ex rel. Darcy v. Handy, 203 F.2d 407, 426-427 (3d Cir.), cert. denied, 346 U.S. 865, 74 S.Ct. 103, 98 L.Ed. 375 (1953), this court recognized that when the attorney's conduct is so lacking in competence or good faith that it shocked the conscience of the court or prosecutor as officers of the state, there was state action for fourteenth amendment purposes. Later the standard of competence was modified in Moore v. United States, supra, but the principle of state action was reaffirmed in United States ex rel. Green v. Rundle, supra. Indeed, it is difficult to imagine how a distinction between assigned and retained counsel in a conflict of interest context could be squared with the duty of the trial judge ". . . of seeing that the trial is conducted with solicitude for the essential rights of the accused." Glasser v. United States, supra, 315 U.S. at 71, 62 S.Ct. at 465. The action of the trial judge in permitting the case to go forward without so much as an inquiry as to potential harm arising from joint representation is the state action complained of. The very fact that courts control admission to their bar of licensed practitioners is a recognition that laymen simply are not equipped to appraise a lawyer's professional skills. A rule which would apply one fourteenth amendment test to assigned counsel and another to retained counsel would produce the anomoly that the non-indigent, who must retain an attorney if he can afford one, would be entitled to less protection from the trial court. The effect upon the defendant-confinement as a result of an unfair state trial-is the same whether the inadequate attorney was assigned or retained. Cf., e.g., Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948).
 
 
 31
 There is much to be said for the rule of the District of Columbia Circuit which assumes prejudice and nonwaiver if there has been no on-the-record inquiry by the court as to the hazards to defendants from joint representation. Campbell v. United States, supra. This case does not require the adoption of a per se rule since, as we have said above, the Walker test has been met. But we reiterate what Judge Rosenn wrote in Government of the Virgin Islands v. Hernandez, supra:
 
 
 32
 "[W]e believe the dangers inherent in joint representation are serious enough . . . to make it highly desirable that [defendants] be apprised of them. If such dangers are communicated to [defendants], difficult questions of whether a conflict of interest arose because of joint representation can be avoided. [Defendants] will intelligently be given the choice of whether to reject joint representation or to waive their right to the unfettered representation made possible by separate counsel."
 
 
 33
 To this admonition we add that the warning should come at the earliest stage of the criminal justice process, so that each defendant can be made aware of the advantages, such as grants of immunity for testimony or more lenient treatment, which sometimes come to those who leave a criminal enterprise and go their own way.
 
 
 34
 The order of the district court will be reversed and the case remanded with a direction that the writ of habeas corpus should issue, discharging the petitioner Hart from State custody unless within a reasonable time to be fixed by the district court he is afforded a new trial.
 
 
 
 *
 Judge Rosen heard argument but died before opinion was filed
 
 
 [1]
 See N.J.Stat.Ann. Sec. 33:1-35 governing inspection of premises licensed to dispense alcoholic beverages. Cf. State v. Zurawski, 89 N.J.Super. 488, 215 A.2d 564 (1965), aff'd, 47 N.J. 160, 219 A.2d 614 (1966). The State did not at the trial contend that the search in question was being made on behalf of the Division of Alcoholic Beverage Control or another license issuing authority