593 F.2d 512
 UNITED STATES of America ex rel. John SULLIVAN, Appellant,
v.
Julius T. CUYLER, Superintendent, State Correctional
Institution, Graterford, Pennsylvania, and the
District Attorney of Philadelphia
County, Appellees.
 No. 78-1411.
 United States Court of Appeals,
Third Circuit.
 Argued Nov. 16, 1978.
Decided Feb. 14, 1979.
Rehearing Denied March 12, 1979.
 
 1
 Marilyn J. Gelb, Philadelphia, Pa., for appellant.
 
 
 2
 Michael F. Henry, Chief, Motions Div., Steven H. Goldblatt, Deputy Dist. Atty. for Law, Edward G. Rendell, Dist. Atty. of Philadelphia, Philadelphia, Pa., for appellees.
 
 
 3
 Before ALDISERT and HUNTER, Circuit Judges, and GERRY, District Judge.*
 
 OPINION OF THE COURT
 
 4
 GERRY, District Judge.
 
 
 5
 This appeal from the denial of a petition for habeas corpus requires this court to consider again the troubling issue of dual representation of multiple criminal defendants by the same counsel. Petitioner, John Sullivan claims, Inter alia, that he was denied his sixth amendment right to effective assistance of counsel at trial because his attorneys also represented his co-defendants. The district court concluded that there had been no dual representation and denied the petition. We reverse.
 
 I.
 
 6
 Petitioner Sullivan was convicted of two counts of first degree murder in 1967 and sentenced to life imprisonment. He has since then continuously attacked his conviction in state and federal court. Before reaching the merits, we must review the confusing series of direct appeals and collateral attacks that form the record in this case.
 
 
 7
 On the evening of June 17, 1966, John Gorey, a minor labor union official, and Rita Janda, his female companion, were shot to death in Gorey's office at the Philadelphia headquarters of Teamsters' Local 107. After a medical examiner's inquest on November 3, 1966, petitioner and two others, Gregory Carchidi and Anthony DiPasquale, were arrested and indicted for the murders.
 
 
 8
 Two attorneys, G. Fred DiBona[1] and A. Charles Peruto, entered appearances on behalf of each of the three defendants. Petitioner, in June, 1967, was the first to come to trial. The defense rested at the close of the Commonwealth's case without presenting any evidence. After the two week trial, the jury convicted petitioner and fixed his punishment at life imprisonment. Carchidi and DiPasquale were later acquitted in separate trials.[2]
 
 
 9
 A three judge panel of the Court of Common Pleas denied petitioner's post trial motions on July 15, 1968, with one judge voting to grant a new trial. After sentence was imposed, petitioner filed a direct appeal to the Pennsylvania Supreme Court. He also filed an application in the trial court for a Writ of Error Coram Nobis which was denied. His appeal was submitted to the supreme court on briefs on November 26, 1969. On December 29, 1971, an equally divided court affirmed his conviction. Commonwealth v. Sullivan, 446 Pa. 419, 286 A.2d 898 (1971). Petitioner, through new counsel, who continues to represent him in this court, twice sought to persuade the supreme court to reconsider its decision. Both applications were denied.[3]
 
 
 10
 Meanwhile, petitioner Sullivan was not content to await the outcome of his state appeal but launched, without benefit of counsel, a collateral attack upon his conviction by petitioning for habeas corpus relief in federal court. His petitions were dismissed.[4] Appellate review and federal habeas corpus having proved unavailing, petitioner collaterally attacked his conviction in the Pennsylvania courts. On October 30, 1973, counsel filed a petition for post-conviction relief under the Pennsylvania Post-Conviction Hearing Act (PCHA), 19 P.S. § 1180-1 Et seq. Five days of evidentiary hearings were held on the petition; Sullivan, Carchidi, Peruto, Judge DiBona, the trial judge, and several other witnesses testified. On November 6, 1974, the PCHA court ruled that petitioner had been denied effective assistance of counsel on appeal and permitted him to file a second direct appeal to the Pennsylvania Supreme Court. All other grounds for relief, including those raised here, were rejected.
 
 
 11
 Petitioner filed his second appeal Nunc pro tunc ; he also appealed from the denial of post-conviction relief on other grounds. The Commonwealth cross-appealed the decision to permit a second direct appeal to be filed. All three appeals were consolidated and argued before the supreme court on January 16, 1975. On February 28, 1977, the court issued an opinion affirming both petitioner's original conviction and the denial of post-conviction relief. Commonwealth v. Sullivan, 472 Pa. 129, 371 A.2d 468 (1977).
 
 
 12
 Having exhausted state remedies,[5] Sullivan filed this petition for habeas corpus in the United States District Court for the Eastern District of Pennsylvania. He alleged the following grounds for relief: (1) that the admission into evidence of color slides of the victims' bodies was a denial of due process; (2) that the factual basis underlying his conviction was so totally devoid of evidentiary support as to deny him due process; (3) that defense counsel had a conflict of interest because they also represented his two co-defendants; (4) that counsel was ineffective for failing to object to certain testimony; (5) that counsel was ineffective for failing to reserve objections to the offering of a secret memorandum to the trial judge; (6) that the trial judge erred in his instructions to the jury so as to deny due process; and (7) that the failure of the prosecution to disclose to the defense certain evidence denied him due process. The petition was referred to a United States magistrate for report and recommendation. The magistrate found that all grounds except dual representation were without merit. He recommended that the writ issue because petitioner's trial counsel also represented his co- defendants and the record disclosed a possibility of prejudice or conflict of interest arising from this dual representation.
 
 
 13
 The district judge denied the petition. He accepted the magistrate's recommendations on every ground asserted except dual representation. As to that ground, he adopted the conclusion of the Pennsylvania Supreme Court that there had been no dual representation. He also found that no conflict of interest actually existed. Petitioner appeals from this order. Because we believe reversal is compelled on the issue of dual representation and conflict of interest, we do not reach the other grounds asserted.[6]
 
 II.
 
 14
 The evidence underlying petitioner's conviction was entirely circumstantial. The Pennsylvania Supreme Court summarized it in the light most favorable to the Commonwealth as follows:
 
 
 15
 The chief prosecution witness, one Francis McGrath was employed as a janitor at the union hall where the bodies were eventually discovered. On July 17, 1966, he arrived at work approximately 6:00 P.M. and parked his automobile in the lot adjacent to the building. At that time, he specifically observed two other vehicles on the premises. One was owned by appellant and the other was being used at the time by one Anthony DiPasquale. After alighting from his car, McGrath noticed appellant looking out onto the parking lot from the window of a second floor office normally used by other union officials. The witness then entered the building and proceeded to the second floor to commence his duties. Appellant was still seated by the window when McGrath entered that office. Sullivan inquired about the janitor's presence and instructed McGrath to wait until Sunday night to clean, since a union meeting was scheduled for that date and the building would require cleaning after the gathering. McGrath ignored the suggestion and continued collecting the trash from the offices. The witness then took the refuse outside the building. When he returned, appellant was still seated at the window.
 
 
 16
 At this time, both Sullivan and McGrath observed John Gorey and Rita Janda arrive at the union hall in Gorey's car and enter the building. McGrath then began cleaning the conference room, located approximately 75 feet from Gorey's office. Shortly thereafter, Gorey appeared and had a brief conversation with McGrath. Immediately after Gorey left the conference room, appellant appeared in the doorway, through which Gorey had just passed, and again questioned McGrath about the cleaning and suggested he defer his activities until Sunday afternoon. During this brief conversation, Gregory Carchidi, another janitor, entered the conference room. No conversation ensued between Carchidi and Sullivan but Carchidi repeated appellant's urgings to leave the work until Sunday. Sullivan then left the room through the same door which Gorey had exited but Carchidi remained and seated himself behind the desk.
 
 
 17
 Within several minutes, the witness testified he heard sounds like firecrackers going off in rapid succession. McGrath started to question Carchidi about the disturbance but was abruptly instructed to "Get out of the building and don't say nothing" (sic). McGrath left the union hall and noticed four cars other than his own parked in the lot. These were recognized as belonging to DiPasquale, Gorey, Carchidi and appellant. McGrath drove off but returned to the premises within 15 minutes. Only Gorey's car remained in the lot. Upon re-entering the building, he found the offices closed, the conference room locked and the lights out.
 
 
 18
 The victims' bodies were discovered the following morning. Gorey had been shot four times and Janda six times, the shots being fired from close range. The ballistics studies established two separate guns were employed in the homicides but the weapons were never recovered.
 
 
 19
 Additional testimony disclosed that the telephone lines had been arranged so that regular incoming calls would ring in the room in which appellant was seated. A second line with a different call number had been prearranged by Gorey to ring in his office so that he could receive an anticipated call from Joseph Vernick at 7:00 P.M. One Irene Glenn testified for the Commonwealth that she dialed the regular union phone number about 6:15 P.M. that evening and a man answered identifying himself as Gorey. A scrap paper found in the wastebasket alongside the desk where appellant had been seated prior to the victim's arrival contained Ms. Glenn's name and telephone number. It was uncontested that the handwriting was that of appellant. Moreover, one Joseph Vernick testified that he called Gorey's office at a specially arranged time but received no answer despite his repeated attempts between 7:15 and 8:15 P.M. This evidence, coupled with the medical examiner's testimony, indicated that the time of death could have been approximately 7:15 P.M.
 
 
 20
 Commonwealth v. Sullivan, supra, 472 Pa. at 147-49, 371 A.2d at 477. See also Commonwealth v. Sullivan, supra, 446 Pa. at 424-27, 286 A.2d at 898-900.
 
 
 21
 Petitioner did not testify and no evidence was introduced on his behalf.
 
 III.
 
 22
 Our first task is to determine whether there was dual representation: that is, whether petitioner was in fact represented by an attorney or attorneys who also represented one or both of his co-defendants. The Pennsylvania Supreme Court considered this issue on petitioner's second appeal and decided:
 
 
 23
 Appellant first claims that he was denied effective assistance of trial counsel because his attorneys also represented two co-defendants who were tried separately for the crime. . . .
 
 
 24
 Upon review of the record from the PCHA proceedings, we find appellant has failed to prove the requisite elements of his claim. First, the testimony establishes that there was no dual representation in the true sense of the term, i. e., the same counsel actively represented co-defendants. Mr. Peruto testified that it was Mr. (now Judge) DiBona who served as chief counsel for appellant during trial and made all decisions relevant to Sullivan's defense while he, Peruto, was merely assisting. These functions were reversed at the trial of the co-defendants where Mr. Peruto was chief counsel and Judge DiBona the assistant. Thus, Judge DiBona served only a minor role in the trial of the co-defendants while devoting his primary efforts to the Sullivan case. This conclusion is supported by Judge DiBona's statements that his stewardship was in no way affected by the consideration of the co-defendant's cases but was solely a product of what he considered to be the best course in his representation of Sullivan. We therefore hold that there is absolutely no evidence that a conflict existed.
 
 
 25
 472 Pa. at 161-62, 371 A.2d at 483.
 
 
 26
 Respondents urge that this conclusion is a finding of fact by a state court after a full hearing which is entitled to a presumption of correctness and should be accepted by this court. Petitioner argues that we should reject it because the record as a whole does not support the supreme court's factual determination. The magistrate accepted petitioner's position while the district judge accepted respondents'. We believe both were mistaken in their approach to this problem. While it is true that state court factual findings are entitled to deference in this court unless they are not fairly supported by the record as a whole, the Supreme Court has defined "facts" very narrowly in this context. In Townsend v. Sain, 372 U.S. 293, 309 n.9, 83 S.Ct. 745, 755, 9 L.Ed.2d 770 (1963), the principal case on the scope of federal court review of state findings on habeas corpus, the Court defined the findings entitled to deference as follows:
 
 
 27
 By "issues of fact" we mean to refer to what are termed basic, primary, or historical facts: facts "in the sense of a recital of external events and the credibility of their narrators . . . ." So called mixed questions of fact and law, which require the application of a legal standard to the historical-fact determinations, are not facts in this sense. (Citation omitted.)
 
 The Court went on to emphasize:
 
 28
 Although the district judge may, where the state court has reliably found the relevant facts, defer to the state court's findings of fact, he may not defer to its findings of law. It is the district judge's duty to apply the applicable federal law to the state court findings independently.
 
 
 29
 362 U.S. at 318, 83 S.Ct. at 760.
 
 
 30
 Properly speaking the supreme court's conclusion that there was no dual representation was not a finding of fact but a legal conclusion the application of a legal standard to the facts developed on the record. We conclude that there was dual representation in this case.
 
 
 31
 Both Judge DiBona and Peruto entered appearances on behalf of petitioner and his two co-defendants shortly after their arrest and indictment. Sullivan had been represented at the inquest by another attorney but could not afford to retain him to represent him on the murder charge. Sullivan testified at the PCHA hearing that while he was imprisoned awaiting trial, he discussed his inability to afford counsel with his two co-defendants who told him they had already made arrangements with "Mr. Peruto and his partner" (Judge DiBona was not identified to petitioner at this time), and that they would represent all three defendants. They told him not to worry, and he agreed to the arrangement. Neither Sullivan nor his family paid any counsel fee to Judge DiBona and Peruto.[7]
 
 
 32
 A unified defense was prepared. One investigation was conducted on behalf of all three defendants. On numerous occasions the three defendants met jointly with both attorneys and discussed the preparation of a defense. The three defendants also met the investigator hired by counsel together and discussed their defense.
 
 
 33
 When Sullivan came to trial, Judge DiBona was his principal trial counsel who made opening and closing speeches and examined witnesses.[8] Peruto, by prearrangement, assisted him. Judge DiBona considered that he and Peruto were "associate counsel" at this trial and at the trials of the two co-defendants. Peruto was present at counsel table throughout the trial. He examined prospective jurors on voir dire. During the trial, he consulted with petitioner, and he and Judge DiBona frequently conferred on matters of trial strategy. He argued motions and objections to the court virtually every day of the trial. After the Commonwealth had completed its proofs, petitioner and counsel had a lengthy private conference on defense strategy, at which Peruto advised petitioner not to testify and not to present witnesses in his defense; this course was eventually chosen. After the verdict was returned, Peruto argued the penalty phase of trial to the jury, which under Pennsylvania law decides between life imprisonment and death in first degree murder cases.
 
 
 34
 The state court based its finding that there was no dual representation on its assessment of Peruto's role in petitioner's defense. It concluded that his role was so minor that he did not represent Sullivan and that the defense was the sole responsibility of Judge DiBona. We believe that an attorney who enters an appearance on behalf of a criminal defendant, consults with him confidentially for the purpose of preparing a defense, investigates his case, aids in the pretrial preparation of his defense, appears at his trial, participates in the selection of the jury that is to decide his fate, argues motions and objections, confers with co-counsel on trial strategy, offers the defendant legal advice, including advice on whether he should testify or present evidence in his defense, and argues the issue of penalty, a matter of life and death, to the jury on the defendant's behalf must be said to represent that defendant and owe to him all the duties an attorney owes to a client in a criminal case. We find that Peruto represented Sullivan as well as Carchidi and DiPasquale.
 
 
 35
 The state court also based its finding of no dual representation on the assumption that Judge DiBona played such a minor role in the trials of the other two defendants that he could be said to represent Sullivan alone. This conflicts with Judge DiBona's understanding of his role; he testified that he and Peruto were "associate counsel in all three cases." It also overlooks the fact that while Peruto eventually acted as principal trial counsel to both Carchidi and DiPasquale that this arrangement was made after Sullivan's trial. At the Sullivan trial, Judge DiBona told the court that he also represented Carchidi, to whom he referred as "my other client," while Peruto represented that he was counsel to DiPasquale as well as co-counsel to Sullivan. Thus, at the time of petitioner's trial which is the critical time Judge DiBona saw himself as "chief counsel" not only to Sullivan, but to his co-defendant Carchidi as well, and Peruto shared this view.
 
 
 36
 Whatever may have been the extent of each attorney's participation in the trials of the various defendants, we are satisfied that it was sufficient to establish that both attorneys represented all three defendants. Petitioner was represented by two attorneys, both of whom also represented his two co-defendants and who seem to have viewed themselves as a defense "team" acting on behalf of all three of the accused.
 
 IV.
 
 37
 A finding of dual representation does not, without more, require reversal. The standard for determining whether representation of co-defendants by the same attorney is a denial of sixth amendment rights was set in this circuit in Walker v. United States, 422 F.2d 374, 375 (3d Cir.) (per curiam), Cert. denied, 399 U.S. 915, 90 S.Ct. 2219, 26 L.Ed.2d 573 (1970).
 
 
 38
 (R)epresentation of codefendants by the same attorney is not tantamount to the denial of effective assistance of counsel guaranteed by the sixth amendment. There must be some showing of a possible conflict of interest or prejudice, however remote, before a reviewing court will find the dual representation constitutionally defective.
 
 
 39
 Numerous recent cases in this circuit have repeated this standard and made clear that actual prejudice or conflict of interest need not be shown.[9] The mere possibility, however remote, is sufficient.
 
 
 40
 This rule recognizes that "(t)he right to counsel guaranteed by the sixth and fourteenth amendments contemplates the services of an attorney devoted solely to the interests of his client." United States ex rel. Hart v. Davenport, 478 F.2d 203, 209 (3d Cir. 1973). Anything less must be regarded as an infringement of the right to counsel. And the Supreme Court has said: "The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial." Glasser v. United States, 315 U.S. 60, 75-76, 62 S.Ct. 457, 467, 86 L.Ed. 680 (1942).
 
 
 41
 The Walker rule also recognizes that after the fact it is often difficult or impossible to determine whether a defendant has been prejudiced by dual representation. Dual representation interferes with an attorney's independent professional judgment. The harm is often in what it tends to prevent an attorney from doing on behalf of his client. Holloway v. Arkansas, 435 U.S. 475, 489-90, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978). For example, an attorney with divided loyalties cannot negotiate a plea agreement on behalf of one client which includes an agreement by that client to testify against a co-defendant the attorney also represents. Id. He may refrain from introducing evidence favorable to one client but harmful to another; or he may refrain from challenging evidence that harms one client but is helpful to another. These and similar conflicts of interest ordinarily do not appear in the record. The Supreme Court recently discussed this problem in Holloway v. Arkansas, supra, and noted:
 
 
 42
 In the normal case where a harmless error rule is applied, the error occurs at trial and its scope is readily identifiable. Accordingly, the reviewing court can undertake with some confidence its relatively narrow task of assessing the likelihood that the error materially affected the deliberations of the jury. But in a case of joint representation of conflicting interests the evil it bears repeating is in what the advocate finds himself compelled to Refrain from doing, not only at trial but also as to possible pretrial plea negotiations and in the sentencing process. It may be possible in some cases to identify from the record the prejudice resulting from an attorney's failure to undertake certain trial tasks, but even with a record of the sentencing hearing available it would be difficult to judge intelligently the impact of a conflict on the attorney's representation of a client. And to assess the impact of a conflict of interests on the attorney's options, tactics and decisions in plea negotiations would be virtually impossible. Thus, an inquiry into a claim of harmless error here would require, unlike most cases, unguided speculation.
 
 
 43
 435 U.S. at 490-91, 98 S.Ct. at 1182.
 
 
 44
 Even where the attorney has failed to undertake certain trial tasks, it is difficult to determine whether prejudice has resulted. For decisions not to offer evidence, or interpose objections, and so forth, may well be legitimate tactical decisions if made by independent counsel. If made by counsel with divided loyalties, they are suspect because a reviewing court cannot reliably determine to what extent the decisions were based on legitimate tactical considerations and to what extent they were the result of impermissible consideration of the best interests of other clients. Accordingly, this court has held that a state conviction cannot stand when an examination of the record reveals that representation by independent counsel "might have made a difference in defense strategy." United States ex rel. Horta v. DeYoung, 523 F.2d 807, 809 (3d Cir. 1975) (per curiam). This is so even if the defense strategy actually chosen would not be subject to attack on the ground of ineffective assistance of counsel had the choice been made by independent counsel.
 
 
 45
 Our examination of the record convinces us that there is in this case at least a possibility of prejudice or conflict of interest and that independent counsel might well have chosen a different trial strategy. Therefore, prior decisions of this court compel reversal.
 
 
 46
 The critical decision counsel made in this case was to rest at the close of the Commonwealth's case without presenting petitioner's testimony or other evidence on his behalf. Although we have little doubt that this would have been a legitimate tactical decision if made by independent counsel,[10] in this case it raises a possibility of prejudice or conflict of interest. The potential for conflict inherent in this situation is vividly demonstrated by Peruto's testimony at the PCHA hearing on the subject of why no defense had been presented.
 
 
 47
 Q. Well, at any rate you had made a decision not to present any testimony anyway, hadn't you?
 
 
 48
 A. In the Sullivan trial?
 
 
 49
 Q. The Sullivan case, yes.
 
 
 50
 A. Yes. I can recall the great discussions that we had with Sullivan where we were so convinced that and we communicated this to Sullivan
 
 
 51
 THE COURT: When you say great discussion, you mean lengthy discussion?
 
 
 52
 THE WITNESS: Lengthy discussion, yes, sir. Where we felt that he couldn't possibly be convicted and, therefore, what's the sense in exposing the defense because we had two more defendants to try.
 
 BY (petitioner's counsel):
 Q. Wait
 
 53
 A. And I'm afraid Sullivan suffered by that fact.
 
 
 54
 Q. Wait just a minute, sir. You were concerned with the other two defendants you represented; is that correct?
 
 
 55
 A. Yes. Why expose your defense if you've got two more people to come to trial and the Commonwealth has not presented a case?
 
 
 56
 Q. So that entered into your consideration as to whether or not you presented a defense in the Sullivan case?
 
 
 57
 A. Sure, it did. When we're talking about back and forth. For example, I've heard Judge DiBona testify today, and, yes, we were sort of playing devil's advocate. I didn't want the defense to go on because I thought we would only be exposing the defendant witnesses for the other two trials that were coming up. . . . And as I look back on that, although it was not my thought that John Sullivan should be short-changed in any fashion, I'm afraid that it was my thought that I was over-solicitous for the other two defendants being ready to be tried.
 
 
 58
 He further testified that he opposed calling three witnesses who had been in the vicinity of Local 107 headquarters at the time the crime was alleged to have occurred because "I . . . recall that I felt that it might be dangerous because one of the other two defendants leaving in a hurry might have been seen by those three witnesses and it might have damaged that defendant and it might have come out on the cross-examination of those witnesses in Sullivan's case."
 
 
 59
 Sullivan's PCHA hearing testimony confirms Peruto's recollection. He testified that at the close of the Commonwealth's proofs, he met with both his attorneys and they discussed whether a defense should be offered and whether he should testify. The reasons offered to him for not doing so were that in counsel's opinion there was not enough evidence to convict him, and there was no reason to risk using evidence that might harm his co-defendants. Peruto told him "there was no sense in putting anything on that may hurt the other two (defendants) because we've got this case won."
 
 
 60
 Respondents do not argue here, as they did in the court below, that Peruto's testimony is unworthy of belief, perhaps because they rely upon it so heavily in support of their contention that there was no dual representation. They do urge us, however, to accept Judge DiBona's explanation instead. He testified that the final decision not to present a defense was made jointly by petitioner and counsel. His decision to advise that course, he testified, was not in any way based upon a desire to protect his other clients, but was entirely based upon his professional judgment that the Commonwealth had not proved its case. Respondents argue that "(t)he testimony clearly shows that appellant's decision that no defense evidence be presented was based on counsel's view, with which appellant concurred, that the Commonwealth had simply not presented sufficient evidence to obtain a conviction."
 
 
 61
 We believe this analysis is seriously flawed. It is undisputed that Peruto participated in the decision not to present a defense. He advised petitioner not to testify and suggest to co-counsel that witnesses not be called. No reason or evidence is offered to explain why an attorney would make the damaging admission of professional impropriety we have quoted were it not true. And Sullivan (albeit not a disinterested witness), corroborates his testimony. We have no basis on which to reject Peruto's sworn admission that he injected improper considerations into the attorney-client relationship.
 
 
 62
 We believe that Peruto's testimony illustrates in the plainest possible terms the potential for conflict of interest. The evidence in this case was scant. What little there was was jealously guarded by the opposing attorneys from premature disclosure. Although counsel owed a duty to petitioner to produce any available evidence which would in their judgment aid his defense, they also owed a duty to his co-defendants not to tip their hand to the Commonwealth. At this trial both parties took maximum advantage of the element of surprise. There was at least a potential conflict among the defendants as to which would receive the benefit of this tactic.
 
 
 63
 Moreover, by asking us to rule that counsel's decision not to present a defense was a legitimate tactical decision, made in good faith on sound professional judgment by Judge DiBona, respondents are asking us to decide that there was in fact no prejudice. This misses the point. The standard requires us to determine whether there is a possibility of prejudice or conflict of interest, However remote. To hold, in the face of this record, that there was not such a possibility would be to, in effect, overrule a long line of cases in this circuit and require a showing of actual prejudice. This we cannot do.
 
 
 64
 There is also other evidence of conflict of interest in this record. A critical thread in the Commonwealth's web of circumstantial evidence was the statement allegedly made to McGrath by Carchidi: "Get out of the building and don't say nothing." This statement was admitted into evidence as a declaration by a co-conspirator.[11] It could only have been rebutted by the testimony of Carchidi. At the PCHA hearing, Carchidi testified that he had not made the statement and was available, and willing, to so testify at Sullivan's trial, but counsel had told him his testimony was unnecessary because the evidence was insufficient to convict. The trial record suggests, however, that the decision not to call Carchidi as a witness may have been made before the close of the Commonwealth's case. Peruto argued to the trial judge that the statement was inadmissible because it could only be refuted by Carchidi "and you can't put Carchidi on the record." This suggests to us that counsel may have decided against using Carchidi as a witness before they knew whether or not the Commonwealth's proofs were sufficient.
 
 
 65
 Both of petitioner's attorneys owed a duty to Carchidi to protect him against possible self-incrimination. They could not have sought to compel him to testify if it were against his interest to do so. We think this situation was much like that presented in United States v. Levy, 577 F.2d 200, 211 (3d Cir. 1978), where this court held that the fact that a criminal defendant had "waived his right to present a witness on his behalf on the basis of advice from an attorney who owed an obligation to that witness, an obligation which may well have conflicted with the attorney's duty of loyalty to (the defendant)" would require a reversal of the conviction "even under a rule requiring a finding of prejudice." These attorneys owed a duty of loyalty to Carchidi which may well have conflicted with the duty they owed petitioner.
 
 
 66
 Respondents also argue that ultimately it was petitioner himself, and not his attorneys, who decided not to take the witness stand and that his decision was based on personal considerations and not influenced by dual representation. Further, they submit, once petitioner had decided not to testify there were no witnesses whose testimony would have been worthwhile. Any complaint about the failure to produce defense witnesses is, in their judgment, illusory. These arguments are also directed to the question whether there was actual prejudice which, as we have noted, we may not consider. We think there are other reasons for rejecting them as well.
 
 
 67
 As to the first argument, it is not at all clear on this record that petitioner did make the ultimate decision not to testify. His hearing testimony was that:
 
 
 68
 A. I had nothing to do with the decision. It was given to me point blank. And Mr. Peruto, after like I say hours of discussion, Mr. Peruto said something to the effect of, "Look, we're the attorneys. You don't know anything about law" I'm not quoting him verbatim, I'm using my own language and your life is in my hands and we're out to protect it, and you're not to worry, that you'll be acquitted and we're assured that you'll be acquitted. And I said, "Look, you got it, you got the ball, carry it."
 
 
 69
 Even had petitioner himself made the ultimate decision not to testify, it is plain that his decision was made on the advice of counsel. For it is undisputed that at least one of his lawyers strongly urged him not to testify. Following this advice can hardly be considered an independent decision that bars petitioner from later complaining of the dual representation that rendered the advice itself suspect. See United States v. Levy, supra, 577 F.2d at 210-11. Indeed it is the very fact that petitioner followed the course suggested by counsel that creates the possibility of prejudice.
 
 
 70
 The contention that there were no witnesses whose testimony would have been useful requires us to speculate as to what witnesses who have never testified, some of whom are now deceased, would have said and whether independent counsel would have used their testimony. This we cannot do. Indeed, it is the purpose of the Walker-Hart rule to avoid such speculation. Judge DiBona, in his opening statement to the jury, offered to produce evidence on petitioner's behalf. Why counsel chose not to present this evidence, and whether independent counsel would have done otherwise, are matters about which we cannot speculate. It is sufficient that independent counsel might have acted differently.
 
 V.
 
 71
 We find that there was in this case dual representation of petitioner Sullivan and his co-defendants. Because we cannot say on this record that the dual representation raised no possibility of prejudice or conflict of interest, however remote, our prior cases compel reversal. We do not reach the other grounds asserted.
 
 
 72
 The order of the district court will be reversed and the case remanded with a direction that the writ of habeas corpus should issue discharging the petitioner John Sullivan from state custody unless within a reasonable time fixed by the district court he is afforded a new trial.
 
 SUR PETITION FOR REHEARING
 
 73
 Present: SEITZ, Chief Judge, and ALDISERT, ADAMS, GIBBONS, ROSENN, HUNTER, WEIS, GARTH and HIGGINBOTHAM, Circuit Judges, and GERRY, District Judge.*
 
 
 74
 BY THE COURT.
 
 
 75
 The petition for rehearing filed by Appellees in the above entitled case having been submitted to the judges who participated in the decision of this court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied.
 
 
 76
 GARTH, Circuit Judge, with whom ADAMS and ROSENN, Circuit Judges, join, dissenting from order denying petition for rehearing:
 
 
 77
 The issue presented by this appeal is whether the appellant Sullivan was deprived of his Sixth Amendment right to effective assistance of counsel, because the privately retained attorneys who represented him at his trial also represented other defendants, who had been charged with Sullivan but who were tried separately and at a date subsequent to Sullivan's conviction of murder. A panel of this court has ordered that a writ of habeas corpus issue, discharging Sullivan from state custody unless the state retries him within a reasonable time. The panel held that this case involved "dual representation" of Sullivan and the defendants in the subsequent trial, and that "(b)ecause we cannot say on this record that the dual representation raised no possibility of prejudice or conflict of interest, however remote, our prior cases compel reversal."
 
 
 78
 In reaching this conclusion, the panel relied principally on United States ex rel. Hart v. Davenport, 478 F.2d 203 (3d Cir. 1973). As in this case, the defendant in Hart was represented by privately retained counsel. Recognizing that in the absence of state action, the attorney's ineffective assistance may not be attributed to the state under the fourteenth amendment, as it incorporates the sixth amendment, this Court held in Hart that,
 
 
 79
 (W)here the questioned conduct of such attorney takes place in the presence of the court or the state attorney, the state action basis for vindication of the alleged fourteenth amendment deprivation is the failure of the state prosecutor or state court to take necessary corrective action.
 
 
 80
 Id. at 210. Where, however, there is no indication that "the state's attorney or the court had knowledge of the alleged deprivation," or that the proceedings are fundamentally unfair because "the attorney's conduct is so lacking in competence or good faith that it (should have) shocked the conscience of the court or prosecutor as officers of the state," the requisite state involvement is missing. See id. See also Fitzgerald v. Estelle, 505 F.2d 1334, 1336-38 (5th Cir. 1975) (en banc). But although state action was found to be present in Hart, there would appear to be no evidence in the present case that the trial judge or the prosecutor was aware, or should have been aware, of the alleged conflict of interest. And certainly nothing in the record suggests that Sullivan's representation by two of Philadelphia's best known trial attorneys was so grossly deficient as to render the proceedings fundamentally unfair.
 
 
 81
 I recognize that judges elsewhere have taken the position that whenever retained counsel's representation is ineffective, state action exists "because the state adjudicatory machinery is inextricably intertwined with the conduct of an accused person's retained attorney." Fitzgerald, supra, at 1345 (Godbold, dissenting). But as I understand it, that is not the law in this Circuit or in any other court of appeals. Nor am I convinced that such an approach to the constitutional requirement of state action comports with present Supreme Court guidelines. In any event, if the majority now wishes to renounce the position taken in Hart in favor of such a rule, En banc consideration would appear to be warranted.
 
 
 82
 I believe that En banc reconsideration is appropriate for a second reason as well. Hart, upon which the panel relied in adopting a standard under which a conflict of interest exists whenever there is a possibility of prejudice, established the standard for a Joint, as distinct from a Dual, representation case. Joint representation, as I understand it, is the representation by the same attorney of two or more defendants at the same trial. Dual representation, on the other hand, is the representation by the same attorney of two or more defendants, each of whom is tried separately and at different times. Hence, I agree with the panel that Sullivan presents a case of dual representation. But Hart, together with all of the other cases upon which the panel has relied, involves joint representation.
 
 
 83
 I believe that there are significant and relevant distinctions that exist between joint representation cases and dual representation cases, none of which have been explored by the panel. In this statement Sur petition for rehearing, I do not think it appropriate to explicate all of the differences which exist. That task is for the panel. I think it important, however, to point out that at the very least, actual prejudice must be found before relief may be afforded on a dual representation claim of the type advanced by Sullivan. I do not believe that the Mere possibility of prejudice, which is the standard under Hart for a case involving joint representation, should be woodenly applied in a case where the defendants were tried separately in individual trials. Moreover, I believe that a defendant who claims that his attorney's representation of other persons at different and discrete trials, deprived him of effective assistance of counsel at his Own trial, must show that he suffered actual prejudice which would have had a material effect on the outcome of his own trial.
 
 
 84
 Whether or not the "finding" by the Sullivan panel of actual prejudice is an appropriate or correct finding in the circumstances of this case does not diminish my concern for the standard enunciated in the opinion. I observe that, prior to this case, we have never established any standard for a dual representation claim, and that to my knowledge, no other Circuit has formulated such a standard. Our decision will affect the conduct of attorneys and litigants in innumerable multi-defendant cases. I therefore believe that it should be the court En banc which formulates the appropriate standard for cases involving claims of dual representation.
 
 
 85
 We should not be oblivious to the practical implications of the panel's decision either. In the wake of Sullivan, which disregards the prerequisites articulated in Hart for a finding of state action and at the same time permits a conflict of interest in a dual representation case to be predicated on the mere possibility of prejudice, however remote, it will be necessary for prosecutors and trial court judges within our jurisdiction to insist that co-defendants never be represented by the same privately retained counsel, even when they are to be tried separately. If prosecutors and judges fail to insist upon separate representation, they run the risk of having convictions overturned, as trial strategy decisions by the attorney, which in retrospect may arguably be seen as favoring one of his clients over the other, are attributed to the state for purposes of the sixth and fourteenth amendments, "even if the defense strategy actually chosen would not be subject to attack on the ground of ineffective assistance of counsel had the choice been made by independent counsel." Slip op. at 521.
 
 
 86
 It is for these reasons that I have voted to grant the petition for rehearing.
 
 
 
 *
 Honorable John F. Gerry, of the United States District Court for the District of New Jersey, sitting by designation
 
 
 [1]
 G. Fred DiBona is now a judge of the Court of Common Pleas in Philadelphia
 
 
 [2]
 Carchidi was acquitted after trial on January 26, 1968; DiPasquale on March 14, 1968. Both were represented at trial by Peruto with Judge DiBona assisting him
 
 
 [3]
 See Commonwealth v. Sullivan, 472 Pa. 129, 180, 371 A.2d 468, 492 (1977) (concurring and dissenting opinion of Pomeroy, J.)
 
 
 [4]
 United States ex rel. Sullivan v. Rundle, No. 69-244 (E.D.Pa., June 12, 1969) and United States ex rel. Sullivan v. Rundle, No. 69-452 (E.D.Pa., Sept. 17, 1969), Certificate of probable cause denied, Misc. No. 1377 (3d Cir., Dec. 31, 1969), were dismissed because petitioner's direct appeal was still pending. United States ex rel. Sullivan v. Johnson, Civil Action No. 73-1694 (E.D.Pa., Sept. 11, 1973) was dismissed for failure to exhaust state remedies
 
 
 [5]
 Respondents concede in their brief that petitioner has exhausted state remedies
 
 
 [6]
 Although we viewed the color slides of the victims' bodies which were introduced at trial, we need not decide whether their admission into evidence denied petitioner his constitutional right to a fair trial. No doubt the court on retrial will be better placed to consider this close evidentiary question which has twice divided the state supreme court
 
 
 [7]
 The matter of who paid these privately retained attorneys was never developed at the PCHA hearing. Apparently, friends of the defendants raised money from contributions and "selling chances," i. e., holding a lottery. What other sources of funds there may have been remains unclear
 
 
 [8]
 It is unclear how it was decided that Judge DiBona would be chief trial counsel. Peruto testified that a meeting was held at which each defendant was asked which lawyer he would prefer to try his case, and Sullivan chose Judge DiBona because of his greater age and experience. Sullivan denied this. He claims to have had no idea that one lawyer was to have principal responsibility for his case; he considered them equally involved in the trial
 
 
 [9]
 United States v. Levy 577 F.2d 200 (3d Cir. 1978); United States v. Dolan, 570 F.2d 1177 (3d Cir. 1978); United States ex rel. Horta v. DeYoung, 523 F.2d 807 (3d Cir. 1975) (per curiam); United States ex rel. Hart v. Davenport, 478 F.2d 203 (3d Cir. 1973); United States v. Rispo, 470 F.2d 1099 (3d Cir. 1973); United States v. Donovan, 464 F.2d 497 (3d Cir.), Cert. denied, 409 U.S. 1044, 93 S.Ct. 542, 34 L.Ed.2d 495 (1972); Government of the Virgin Islands v. John, 447 F.2d 69 (3d Cir. 1971); United States ex rel. Small v. Rundle, 442 F.2d 235 (3d Cir. 1971); United States ex rel. Darrah v. Brierley, 415 F.2d 9 (3d Cir. 1969)
 
 
 [10]
 Indeed, the Pennsylvania Supreme Court evenly divided on the issue of whether the evidence was sufficient to support a conviction. Commonwealth v. Sullivan, supra, 446 Pa. 419, 286 A.2d 898 (1971)
 
 
 [11]
 Argument over the admissibility of this statement at trial centered on whether or not it was a co-conspirator declaration. On the first direct appeal, the Pennsylvania Supreme Court ruled that it was admissible under the spontaneous utterance or res gestae exception to the hearsay rule and did not decide whether it was a declaration by a co-conspirator, 446 Pa. at 439, 286 A.2d at 906. The court abandoned this view on the second direct appeal and ruled that it was admissible as a co-conspirator declaration and declined to reach any other grounds. 472 Pa. at 159-60, 371 A.2d at 482-3. This is, of course, the final decision of the Pennsylvania courts on this point of state evidence law
 
 
 *
 Honorable John F. Gerry, of the United States District Court for the District of New Jersey, sitting by designation