**UNITED STATES of America, Appellee,**

v.

**LAURA, Priscilla Dominguez, Appellant.**

**Nos. 80–2690, 81–1051.**

United States Court of Appeals,
Third Circuit.

Argued Sept. 18, 1981.

Decided Dec. 15, 1981.

---

Paul Casteleiro (argued), Hoboken, N. J., James S. Rothstein, Reading, Pa., for appellant.

James J. Rohn (argued), Asst. U. S. Atty., Peter F. Vaira, Jr., U. S. Atty., Walter S. Batty, Jr., Asst. U. S. Atty., Chief, Appellate Division, Philadelphia, Pa., for appellee.

Before GIBBONS and HUNTER, Circuit Judges and STERN,* District Judge.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge.

The appellant, Priscilla Dominguez Laura, pled guilty in October 1976 to charges of importing and conspiring to import cocaine in violation of 21 U.S.C. §§ 952, 963.[1]  Appellant was sentenced by the district court for the Eastern District of Pennsylvania in June 1977 to five years probation on each of two counts of the indictment, to run concurrently.  Following an unrelated 1978 conviction in a federal district court in Florida for possession and distribution of cocaine, the Government moved the district court for the Eastern District of Pennsylvania to vacate appellant's probation.  At that time, appellant moved to withdraw her 1976 guilty plea and to vacate the 1977 sentence.

This appeal raises the following issues:

a) Was appellant deprived of her sixth amendment right to the effective assistance

---

* Honorable Herbert J. Stern, United States District Judge for the District of New Jersey, sitting by designation.

1.  21 U.S.C. § 952 provides:
    (a) It shall be unlawful to import into the customs territory of the United States from any place outside thereof (but within the United States), or to import into the United States from any place outside thereof, any controlled substance . . . or any narcotic drug . . . .

21 U.S.C. § 963 provides:
    Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

of counsel because of the joint representation of herself and her co-defendant husband by the same attorney?

b) Did the lower court err in finding that appellant waived her right to separate representation?

c) Did the lower court err in finding that the trial court's acceptance of appellant's guilty plea was not prejudicial error?

We have reached the following conclusions:

a) The actual conflict of interest which resulted from the joint representation of appellant and her co-defendant husband did not adversely affect the representation afforded her. Thus, she was not deprived of her right to effective assistance of counsel.

b) The lower court did not err in finding that appellant executed a valid waiver of her right to separate counsel. The record supports the lower court's conclusion that the trial court conducted a proper inquiry into the joint representation of appellant and her husband.

c) Because appellant failed to allege or prove any prejudice, the lower court did not err in finding that the trial court's alleged technical non-compliance with Fed.R. Crim.P. 11 in accepting appellant's guilty plea did not justify relief.

Therefore, we affirm the judgment of the district court in all respects.

## FACTS

Appellant Laura and her husband, Anthony Laura, were among twelve defendants charged in February 1976 with participating in a cocaine-importing scheme. Appellant was charged under two counts of the indictment with violating 21 U.S.C. §§ 952, 963; her husband was charged under all five counts of the indictment, which additionally charged violations of 21 U.S.C. §§ 841, 846.[2]

The Lauras retained the same attorney to represent them in the proceedings. On April 13, 1976, the district court, Judge Daniel H. Huyett, III (the "trial court"), ordered that all defendants retain separate counsel. The Lauras' attorney, Robert I. Kalina, moved to vacate this order. In support of this motion, Kalina submitted an affidavit from himself and one from each of his clients, the appellant and her husband. The latter two affidavits were identical except that references to "my husband" in appellant's affidavit were replaced with "my wife" in appellant's husband's affidavit. The affidavit from appellant, which was prepared by Kalina and sent to appellant for her signature, expressed appellant's belief that she could best be represented by Kalina even though he also represented her husband. At one point the affidavit states that appellant "perceive[s] no conflict of interest." Appendix at 104. Noting that the issue of conflict of interest had been raised not by the court, but by application of the Government, the affidavit continues:

I know of no substantive reason cited for the application other than that the prosecution might give discovery to one defendant that it might not give to another and that plea bargaining with one may someway effect [*sic*] the other. I do not wish to entertain plea bargaining and wish to go to trial in this matter if the Court decides the motions to dismiss the indictment herein adverse [*sic*] to me. Additionally, the Court must be aware that whatever discovery is given to the defense in this case will be shared between the defendants. To think otherwise, is an exercise in naivety. My defense is being burdened for some purpose I cannot perceive.

As I understand it, there is a privileged relationship between my husband and

---

**2.** 21 U.S.C. § 841 provides:

  (a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

  (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance ....

21 U.S.C. § 846 provides:

Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

myself that would preclude the last vestige of conflict of interest.

Appendix at 105–06.

On April 27, 1976, Judge Huyett conducted an inquiry on the issue of Kalina's representation of both appellant and her husband. Judge Huyett requested that Kalina

step forward with your clients and ... have each of them make a statement on the record that will roughly parallel the information in the affidavit so there is no question that they understand their rights, that they waive them, that they wish you as their attorney, [and] believe there is no conflict of interest.

Appendix at 8–9. The court did not address the appellant directly. Kalina undertook the examination of appellant:

Q. You have retained me to represent you in this matter?

A. Yes.

Q. Am I the attorney of your choice?

A. Yes.

Q. Are you aware that Anthony Laura retained me?

A. Yes.

Q. We have discussed this case and reviewed the facts of this case?

A. Yes.

Q. Do you perceive a conflict of interests in my representing you both, you and Anthony in this case?

A. No.

Q. Do you desire to have me represent you while representing Anthony in this case?

A. Yes.

Q. . Do you waive the claim to raise the issue at any point in this matter?

A. Yes.

Q. Have I informed you that the Court stated to me in a conference on April 15, 1976, in this Courthouse that either you or Anthony should obtain other counsel and I could not represent both of you?

A. Yes.

Q. Do you believe that would deprive you of counsel of your choice?

A. Yes.

Q. Do you believe I can represent your best interests in this case while representing Anthony?

A. Yes.

Q. Can you afford to retain other counsel?

A. No, I cannot afford it.

Appendix at 120–21. The attorney for the Government stated at the hearing that despite the waiver, he objected to the representation of the appellant and her husband by Kalina:

[W]e feel that the interest of Priscilla Dominguez Laura and the interest of [her husband] are completely different, that the culpability is somewhat different and that dual representation of each will either work to the detriment of both or perhaps to the benefit of both if everything goes swimmingly. The point is there is an inherent conflict there because they cannot be represented [by Kalina].

Appendix at 9. The trial judge accepted the waiver of the defendant and her husband, ruled that Kalina could continue to represent them in pretrial proceedings, and told the Government's attorney to file a motion at any time during trial if he believed that there was a conflict of interest requiring separate trial counsel. Kalina in fact continued as counsel to appellant and her husband throughout the proceedings in Judge Huyett's court.

The case did not go to trial. In October 1976 a plea agreement was reached whereby all defendants, including appellant, agreed to retract their former pleas of not guilty, and to plead guilty to the indictment. The guilty pleas of eight of the defendants, including the appellant's, were entered, at the same time, on October 18, 1976.

Before accepting appellant's guilty plea, Judge Huyett addressed the defendants en masse. He read Count 1 of the indictment, expressly omitting the overt acts set forth therein. He then asked: "Do any of you have any questions concerning the charges against you in Count 1?" As

Judge Huyett read the defendants' names, each of them, including appellant, replied "No, sir." The same procedure was followed for each count of the indictment. The prosecutor then recited the facts that would be proven at trial, essentially repeating the text of the indictment. Each defendant stated that the prosecution's recital of facts was true. Judge Huyett accepted appellant's guilty plea.

On June 20, 1977, Judge Huyett imposed concurrent five-year probationary terms upon appellant's pleas of guilty to Counts 1 and 2. Appellant's husband was sentenced to two years imprisonment and a special parole term on each count to which he pled guilty, to run concurrently.

In August 1978, appellant was convicted in a federal court in Florida of involvement in another cocaine scheme. Based on this conviction, Judge Huyett held a hearing on November 21, 1978, regarding appellant's violation of her probation. On that day, appellant filed a motion pursuant to Fed.R.Crim.P. 32(d)[3] to withdraw her guilty plea under the 1976 indictment, and to vacate sentence.[4] On December 27, 1978, appellant filed a motion to transfer the case to another judge based on a conflict of interest between her newly retained local counsel, James S. Rothstein, and Judge Huyett. On December 28, 1978, Judge Huyett dismissed Rothstein from the case, denied all of appellant's motions, revoked her probation, and sentenced her to a prison term.

An appeal was taken to this court. We reversed solely on the ground that the dismissal of attorney Rothstein was unsupported on the record. *United States v. Laura*, 607 F.2d 52 (3d Cir. 1979). On remand, 500 F.Supp. 1347, Judge Huyett ordered that the case be transferred to another judge, and vacated all of his orders of December 28, 1978. He ordered that appel-

lant's motions to withdraw her guilty plea and to vacate sentence, and the petition to revoke probation, be reconsidered *ab initio* by the transferee court.

On June 6, 1980, Judge Broderick (the "district court") conducted a hearing on the pending motions and petition. The only witness at the hearing was appellant. The government offered no evidence. On the conflict of interest issue, appellant testified that Kalina had been hired and paid by her husband, and that the extent of her private consultation with Kalina outside the presence of her husband was ten minutes, although long conferences were held with both clients present. She testified that Kalina never explained the contents of her "conflict of interest" affidavit, never explained what a conflict of interest was, and never told her how a conflict could affect a plea bargaining situation. She further testified that Kalina had presented the plea agreement to her as an "all-or-nothing" deal: the agreement would be accepted by the government only if all defendants pled guilty. She stated that Kalina told her that the plea agreement was extremely beneficial to her husband because he would receive a two year sentence pursuant to the plea agreement, whereas if he went to trial he would be convicted because of the overwhelming evidence against him and could be sentenced to imprisonment for fifteen years. She also testified that until the plea agreement was offered, Kalina had assured her that she had no reason to fear going to trial, but that after the plea agreement was offered, Kalina told her that her decision not to plead guilty would mean that her husband would receive a fifteen year sentence. Appendix at 10.

Judge Broderick found that appellant had identified an actual conflict of interest. Appendix at 12. However, he also found that appellant had executed a

---

**3.** Rule 32(d) provides:

A motion to withdraw a plea of guilty or *nolo contendere* may be made only before sentence is imposed or imposition of sentence is suspended; but to correct manifest injustice the court after sentence may set aside the judg-

ment of conviction and permit the defendant to withdraw his plea.

**4.** Until the motion to vacate probation was filed, appellant made no effort to challenge the sentence which had been imposed seventeen months earlier.

waiver of her right to separate counsel. Judge Broderick based the latter finding on several factors: the inquiry in which Kalina examined appellant regarding the conflict of interest; the affidavit submitted by appellant; that although appellant testified that no one *explained* to her the meaning of her affidavit or of conflict of interest, she never testified that she did not *understand* them; that appellant's motion to withdraw her guilty plea and vacate sentence was not made until after a petition to revoke her probation had been filed with the court; that appellant appeared to be an intelligent woman, she had attended college, and was 22 years old when she executed the waiver. To the extent that her testimony conveyed that her waiver was not knowing, voluntary, or intelligent, Judge Broderick found appellant's testimony not credible. Appendix at 13–14.

With respect to appellant's claim that the trial court had not complied with Fed.R.Crim.P. 11 in accepting her guilty plea, Judge Broderick found that the hearing conducted by Judge Huyett was satisfactory. He also found that appellant failed to allege or prove that she was prejudiced by the trial judge's alleged noncompliance with Rule 11, insofar as appellant failed to assert that stricter compliance with Rule 11 would have brought about a change in her plea decision.

## DISCUSSION

*The Right to Effective Assistance of Counsel*

■ Appellant claims that the actual conflict of interest which existed in the joint representation of herself and her husband deprived her of her sixth amendment right to the effective assistance of counsel. The standard for determining the validity of appellant's claim has recently been clarified by the United States Supreme Court.

In *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), the Supreme Court reversed a decision of this court which had held that a sixth amend-

ment violation could be established by showing a "possibility of prejudice or conflict of interest, *however remote." United States ex rel. Sullivan v. Cuyler,* 593 F.2d 512, 522 (3d Cir. 1979) (emphasis in original). The Court noted that, under the standard enunciated by the court of appeals, virtually every instance of multiple representation would constitute a sixth amendment violation. 446 U.S. at 348, 100 S.Ct. at 1718. Thus, the Court held, "[i]n order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Id.* (footnote omitted). Although the Court held that the defendant need not demonstrate prejudice resulting from the inadequate representation, the Court emphasized that the defendant must show "that a conflict of interest actually affected the adequacy of his representation." 446 U.S. at 349–50, 100 S.Ct. at 1718–19.

■ The recent decision in *United States v. Morrison,* 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981), illustrates the need for a showing of adverse effect in a case in which ineffective assistance of counsel is alleged. In *Morrison,* federal agents, aware that the defendant had retained counsel, met and conversed with her without the knowledge or permission of her counsel. In the course of this conversation, the government agents disparaged defendant's counsel, and suggested that she could be better represented by the public defender. 449 U.S. at 362, 101 S.Ct. at 666. Based on these facts, we concluded that defendant's sixth amendment right to counsel had been violated, and that she was entitled to relief, as the Supreme Court paraphrased us, "whether or not any tangible effect upon [her] representation had been demonstrated or alleged...." 449 U.S. at 363, 101 S.Ct. at 667.[5]

The Supreme Court reversed. The Court assumed that the actions of the government agents violated defendant's

---

**5.** This court's opinion is reported at 602 F.2d 529 (3d Cir. 1979).

sixth amendment right to counsel. It stated that "[o]ur cases have ... been responsive to proven claims that governmental conduct has rendered counsel's assistance to the defendant ineffective." *Id.* The Court further noted:

[T]he premise of our prior cases is that the constitutional infringement identified has had or threatens some adverse effect upon the effectiveness of counsel's representation or has produced some other prejudice to the defense. Absent such impact on the criminal proceeding, however, there is no basis for imposing a remedy in that proceeding, which can go forward with full recognition of the defendant's right to counsel and to a fair trial.

449 U.S. at 365, 101 S.Ct. at 668. · Although the government agents had acted improperly, the defendant in *Morrison* failed to allege or prove that this improper action had had *any* effect on her representation. Thus, she failed ·to demonstrate a deprivation of her right to the effective assistance of counsel.

In the instant case, appellant testified that her attorney informed her that she would probably be acquitted if she went to trial, but that the plea bargaining agreement offered to her and her co-defendants was presented as an "all-or-nothing" deal. The attorney also provided appellant with information regarding the value of the agreement to her husband. This information was relevant to appellant's plea decision. Appellant does not allege or show that the information was relayed to her in a coercive manner or that her attorney suggested a course of action to be taken by her. Indeed, if her attorney had been adversely influenced by his representation of appellant's husband, and wished to coerce appellant into accepting the plea agreement, he would not have told appellant that she was likely to be acquitted if she proceeded to trial.[6]

Appellant's attorney did nothing more than inform appellant of the probable consequences of the actions available to her. Thus, even if an actual conflict of interest existed in the joint representation of appellant and her husband, it did not affect the adequacy of her representation and did not deprive her of her sixth amendment right to the effective assistance of counsel.

*Waiver of the Right to Separate Counsel*

■ In *United States ex rel. Hart v. Davenport*, 478 F.2d 203, 211 (3d Cir. 1973), this court held that the right to separate counsel may be waived so long as the dangers inherent in joint representation are explained to a defendant at the earliest possible time in the proceeding. *Accord, United States v. Dolan*, 570 F.2d 1177, 1180–81 (3d Cir. 1978). *See Cuyler v. Sullivan*, 446 U.S. 335, 351, 100 S.Ct. 1708, 1720, 64 L.Ed.2d 333 (1980) (Brennan, J., concurring). Appellant asserts that the trial court failed to meet the requirements of *Davenport* in accepting her waiver. We do not agree.

The record reveals that the trial court was alert to the danger of conflict from the start of these proceedings. It was the trial court which originally ordered that appellant and her husband obtain separate counsel. The trial court did not permit joint representation to continue until after it conducted an inquiry which satisfied it that appellant understood the importance of her decision to waive her right to separate counsel. At this inquiry, the court had an opportunity to observe the appellant as she testified regarding the conflict issue. In the appellant's presence, the Government noted the possible dangers involved in the joint representation. The trial court was in the best position to evaluate whether appellant's waiver was knowing, intelligent, and voluntary.

Moreover, a second hearing on the waiver issue was conducted, this time before Judge Broderick. Judge Broderick reviewed the inquiry conducted by the trial

---

**6.** We note that appellant nowhere alleges that any of the information provided by Kalina was   untrue.

court. He also received testimony from appellant; the Government offered no evidence. Again, Judge Broderick had ample opportunity to observe appellant as she testified on this question. He noted in his opinion that, although appellant testified that no one *explained* the conflict of interest situation to her, she did not testify that she did not *understand* the hazards of joint representation. Judge Broderick found appellant to be an intelligent woman who understood the meaning of her decision. His evaluation of appellant paralleled that of the trial court.

Judge Broderick also noted the setting in which appellant *first* challenged the validity of her waiver of separate representation. Appellant entered her initial guilty plea in October 1976 and was sentenced in June 1977. Over a year later, in August 1978, appellant was convicted and sentenced to imprisonment in a federal court in Florida for her involvement in a cocaine scheme that was *unrelated* to the scheme for which she had previously been sentenced. The second cocaine scheme was carried out during appellant's probation on the first offense. The government, based on these facts, petitioned the federal court in Pennsylvania to vacate appellant's original sentence of probation. In November 1978, Judge Huyett conducted a hearing regarding appellant's violation of her probation. Then and only then did appellant challenge the validity of the waiver she executed during the first proceeding.

■ Under these circumstances, there is ample support in the record for both the trial court's and the district court's conclusion that appellant made a knowing, intelligent, and voluntary waiver of her right to separate counsel.

*Acceptance of Appellant's Guilty Plea*

Appellant's final claim is that the trial court failed to comply with Fed.R. Crim.P. 11 in accepting her guilty plea. Rule 11 provides in part that

[b]efore accepting a plea of guilty or nolo contendere, the court must address the defendant personally in open court and

inform him of, and determine that he understands, the following:

(1) the nature of the charge to which the plea is offered. . . .

Appellant asserts that the trial court failed technically to comply with this requirement because it omitted a discussion of the overt acts allegedly committed by appellant, and because it did not engage in an extensive colloquy with appellant regarding her plea decision.

The district court rejected appellant's Rule 11 claim on the ground that appellant failed to allege or prove any prejudice resulting from the trial court's technical non-compliance with the rule. In so doing, the district court relied on this court's decision in *United States v. Horsley*, 599 F.2d 1265 (3d Cir.), *cert. denied*, 444 U.S. 865, 100 S.Ct. 135, 62 L.Ed.2d 88 (1979).

The *Horsley* opinion relied on the Supreme Court's decision in *United States v. Timmreck*, 441 U.S. 780, 99 S.Ct. 2085, 60 L.Ed.2d 634 (1979). In *Timmreck*, as in the instant case, the petitioner moved to vacate his sentence on the ground that the district judge failed to comply with Rule 11. The petitioner did not, however, allege any specific prejudice arising out of the asserted violation of the rule. The Supreme Court denied the claim, holding that "collateral relief is not available when all that is shown is a failure to comply with the formal requirements of the Rule." 441 U.S. at 785, 99 S.Ct. at 2088, *quoting Hill v. United States*, 368 U.S. 424, 429, 82 S.Ct. 468, 471, 7 L.Ed.2d 417 (1962).

■ The appellant in this case, like those in *Timmreck* and *Horsley*, failed to allege or prove any specific prejudice resulting from the technical non-compliance with Rule 11. Appellant did not argue that, had there been compliance, her plea decision would have been different. Therefore, the district court did not err in rejecting appellant's Rule 11 claim.

Based on the foregoing discussion, appellant has failed to show the "manifest injustice" required under Fed.R.Crim.P. 32(d) to warrant the setting aside of a

conviction and the withdrawal of a guilty plea. The judgment of the district court will be affirmed.

STERN, District Judge, dissenting.

A 22-year old woman, told by both the government and her "own" lawyer that her husband would face an additional ten to twelve years in prison if she did not plead,[1] waived all of her constitutional rights and pled guilty. Her guilty plea was accepted by a trial court utilizing procedures in clear violation of Fed.R.Crim.P. 11. From first to last, she was represented by the same lawyer who represented her husband, a situation involving an actual conflict of interest of the gravest magnitude; yet when she "chose" to be jointly represented with her husband, she was told, and believed, that there was no conflict of interest and nothing to waive, a misconception which the trial judge did nothing to correct in spite of the government's urging to the contrary.

I am unable to agree with the majority's acceptance of these "procedures." Only if we confine our interest to preserving this conviction can we fail to see that appellant, while waiving nothing, was permitted to bargain herself into a conviction in order to save a co-defendant represented by the same lawyer, culminating in a proceeding in which the requirements of Rule 11 were brushed aside.

## I. *The Conflict of Interest*

The majority accepts the finding below that appellant's representation involved an actual conflict of interest, but considers this irrelevant because it finds, first, that appellant "waived" her right to raise the conflict issue and, second, that she has not demonstrated an injury. I must dissent. The record demonstrates that she did not waive her right to unconflicted representation— indeed, she did not even know that a conflict existed. Further, the law does not require her to demonstrate how she was prejudiced—or, as the majority terms it, "adversely affected"—by the conflicted rep-

resentation. Moreover, even if such a burden were placed upon her, Mrs. Laura has satisfied it.

The majority repeatedly observes that appellant knowingly and intelligently waived her right to "separate" counsel. Maj. op. at 372–373. Yet waiver of separate counsel is meaningless; what must be found is a waiver of "the right to effective assistance of an attorney who is singly devoted to the defendant." *United States v. Levy*, 577 F.2d 200, 211 (3d Cir. 1978). The majority does not, and cannot, state that appellant waived her right to *unconflicted* counsel, or to his effective assistance, for she was repeatedly told that there was no conflict or disability for her to waive.

In the affidavit, recognized by the majority as prepared by her lawyer, appellant states that she "perceive[d] no conflict of interest in the joint representation," app. at 104, a statement paralleled by her attorney's assertion in his affidavit that "I perceive no conflict of interest herein." App. at 110. Asked by her attorney at the hearing before Judge Huyett whether she perceived a conflict of interest, appellant replied "no." App. at 120. As a result, appellant saw the provision of separate counsel as burdening her defense "for some purpose I cannot perceive." App. at 105–06. The majority, as did Judge Broderick, finds it important that appellant never stated that she did not understand the hazards of joint representation. Maj. op. at 372. Putting aside the fact that lack of understanding of such hazards by laymen should be presumed, and putting aside also that waiver proceedings are intended to establish, *affirmatively*, that a defendant does understand what is being waived, appellant's affidavit explicitly states that she could not perceive the basis for the requirement that she retain separate counsel. Appellant, therefore, clearly did not know and therefore did not waive the hazards involved. While she may, in some mechanical sense, have indicated that she wanted Kalina to represent both her and her husband, she

[1]. Maj. op. at 370.

clearly did not, and could not, waive the right to be served by an attorney unencumbered by a conflict of interest since she believed what she was told: there was nothing to waive.

Appellant's failure to perceive that a conflict of interest existed is a reflection of the manner in which the trial court accepted her "waiver." Confronted with the erroneous information contained in the affidavit and with appellant's misconception that there was no conflict, the trial court remained silent.[2] The judge did not "address [appellant] personally and forthrightly advise [her] of the potential dangers of representation by counsel with a conflict of interest," *United States v. Dolan*, 570 F.2d 1177, 1181 (3d Cir. 1978), but instead relied on a rote recitation in which the conflicted lawyer elicited monosyllabic answers to leading questions based on the erroneous affidavit.[3] Appellant was never asked if she understood the hazards of joint representation. The trial judge did not inquire into the discrepancy between the avowal in the lawyer-prepared affidavit that she could afford another lawyer, but wanted Kalina and only Kalina, and her verbal testimony, in her own words at the hearing,

that she could not afford separate counsel. More importantly, the court never advised her that she was not financially tied to her husband; that it would appoint separate counsel for her at no expense to her. When the government, which now contends that there was no conflict, reiterated its contention that a conflict existed and that separate counsel was necessary, the trial court summarily closed the subject by stating "[a]ll right. Anything else?"[4]

To accept this as a waiver, as the majority does, will permit trial courts in the future to use this as the standard of "waiver": a rote recitation without any indication that the defendant knows what is being waived. Today's decision eviscerates the requirement that a waiver be knowing and intelligent and also the duty of trial courts to warn jointly represented defendants of the hazards of their course of action, a duty enunciated eight years ago for this Circuit in *United States ex rel. Hart v. Davenport*, 478 F.2d 203, 209 (3d Cir. 1973), and recently made applicable to all federal courts.[5] We now march backward, holding that it is for the defendant to show she did not understand the conflict rather than for the *record* to demonstrate that she did.

---

**2.** The majority's statement that "the appellant nowhere alleges that any of the .information provided by Kalina was untrue," maj. op. at 371 n.6, ignores the erroneous statements contained in the affidavit itself. According to the affidavit, for example, the existence of the marital privilege between appellant and her husband "would preclude the last vestige of conflict of interest." App. at 106. In fact, the existence of the marital privilege creates peculiar problems for jointly-represented defendants because spouses in such a situation may be confronted with differing interests as to the choice of either declining to testify on their own behalf or abandoning the marital privilege. *See generally*, Note, *Marital Privileges and the Right to Testify*, 34 U.Chi.L.Rev. 196 (1966). This Court has on at least one occasion reversed a conviction on the basis of a conflict of interest involving the joint representation of a husband and wife. *United States ex rel. Horta v. De Young*, 523 F.2d 807 (3d Cir. 1975). *Cf. Gov't of the Virgin Islands v. Hernandez*, 476 F.2d 791 (3d Cir. 1973) (trial judge must warn a husband and wife of the dangers of joint representation). Mrs. Laura's mistaken belief that the marital privilege obviated any potential conflict of interest must have been based on incorrect information supplied by her lawyer.

The affidavits also erroneously state that the *only* dangers appellant faced by foregoing separate counsel related to plea bargaining and discovery, and that the former danger was irrelevant, since she did not intend to plead, while the latter was an "exercise in naivety [sic]" because the Lauras intended to share all discovery.

**3.** At the time the trial court considered appellant's waiver, *Dolan* had not yet been decided. *Dolan*, however, is germane to our analysis of the sufficiency of the trial court's actions at the waiver hearing. The trial court's failure to follow procedures even remotely resembling those set forth in *Dolan* demonstrates the inadequacy of the trial court's satisfaction of the obligations set forth in *United States ex rel. Hart v. Davenport*, 478 F.2d 203 (3d Cir. 1973).

**4.** At no time did the trial judge actually make a finding as to whether a conflict existed, or as to whether Mrs. Laura had waived such a conflict if it did exist.

**5.** See Fed.R.Crim.P. 44(c), effective Dec. 1, 1980.

Having shown that she did not waive the right to effective assistance of counsel and that her counsel faced an actual conflict of interest, appellant need show no more to establish a denial of her Sixth Amendment right to the effective assistance of counsel. Indeed, the majority's requirement that appellant specifically show how the conflict affected her representation has been rejected by the Supreme Court in *Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978). Arguing that a showing of prejudice is often impossible where a conflict of interest has been identified, the Court stated that:

"Joint representation of conflicting interests is suspect because of what it tends to prevent the attorney from doing. For example, in this case it may well have precluded defense counsel for Campbell from exploring possible plea negotiations and the possibility of an agreement to testify for the prosecution, provided a lesser charge or a favorable sentencing recommendation would be acceptable. Generally speaking, a conflict may also prevent an attorney from challenging the admission of evidence prejudicial to one client but perhaps favorable to another, or from arguing at the sentencing hearing the relative involvement and culpability of his clients in order to minimize the culpability of one by emphasizing that of another. Examples can be readily multiplied. . . .

[A] rule requiring a defendant to show that a conflict of interests—which he and his counsel tried to avoid by timely objections to the joint representation—prejudiced him in some specific fashion would not be susceptible of intelligent, even-handed application. In the normal case where a harmless-error rule is applied, the error occurs at trial and its scope is readily identifiable. Accordingly, the reviewing court can undertake with some confidence its relatively narrow task of assessing the likelihood that the error materially affected the deliberations of the jury. Compare *Chapman v. California, supra*, [386 U.S.] at 24–26, 87 S.Ct. at 828–829, with *Hamling v. United States,*

418 U.S. 87, 108, 94 S.Ct. 2887, 2902, 41 L.Ed.2d 590 (1974), and *United States v. Valle-Valdez*, 554 F.2d 911, 914–917 (CA9 1977). But in a case of joint representation of conflicting interests the evil—it bears repeating—is in what the advocate finds himself compelled to *refrain* from doing, not only at trial but also as to possible pretrial plea negotiations and in the sentencing process. It may be possible in some cases to identify from the record the prejudice resulting from an attorney's failure to undertake certain trial tasks, but even with a record of the sentencing hearing available it would be difficult to judge intelligently the impact of a conflict on the attorney's representation of a client. And to assess the impact of a conflict of interests on the attorney's opinions, tactics, and decisions in plea negotiations would be virtually impossible. Thus, an inquiry into a claim of harmless error here would require, unlike most cases, unguided speculation."

435 U.S. at 489–91, 98 S.Ct. at 1181–82. Each and every decision made by Mrs. Laura's attorney was tainted by the presence of an actual conflict of interest. Therefore, she was deprived of the effective assistance of counsel. Where a defendant is convicted while deprived of the assistance of counsel and where the right to such assistance has not been waived, the conviction must be reversed. *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963).

*Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), a case relied upon heavily by the majority, is inapposite here. In *Cuyler*, no one had identified a conflict of interest at or before trial. The Court held that in such a situation a defendant must demonstrate the existence of an actual conflict of interest. The rule in *Cuyler* was clearly intended to prevent a convicted defendant who had been jointly represented at trial from canvassing the trial record on appeal in a belated effort to identify conflicts that were never raised below. Here, however, the conflict was identified by the government before trial, appellant was assured by her conflicted

counsel that there was no conflict, the trial court had a duty to step forward and warn the defendant of the dangers of joint representation and an actual conflict of interest was indeed present. *Cuyler*, then, is not dispositive; it is not even apposite.[6]

Moreover, even if a showing of prejudice, or "adverse effect," is required in this situation, which it is not, it is manifest on this record that appellant was prejudiced by the joint representation at issue here—she was convicted upon a plea of guilty induced by the urging of the conflicted attorney in order to save his other client.[7] The majority bases its finding of no adverse effect on its belief that even in the presence of the conflict, Kalina informed appellant that she would probably be acquitted at trial. Maj. op. at 371–372. The record, however, shows that once an "all-or-nothing" plea bargain had been offered, appellant was no longer told that she would be acquitted, but rather that she "was in fact going to sentence her husband for her decision; if I didn't go along, he would surely receive a

fifteen-year sentence." App. at 45. The change in Kalina's advice after the offer of the "all-or-nothing" bargain establishes that the actual conflict adversely affected appellant's representation.

It is, for me, remarkable to be able to find on this record a waiver—from a defendant who in open court said she saw nothing to waive—but to be unable to unearth any prejudice when a shared lawyer urges one spouse to plead guilty in order to save the other.[8]

In sum, I would hold that appellant did not waive her right to the assistance of unconflicted counsel. The fact that she did not object to the joint representation before she entered her guilty plea is meaningless in light of the continual representations to her that there was no conflict to waive and in the shadow of the trial court's failure to warn her of this untruth or of the dangers in the joint representation. Though it need not be shown, the pervasive effect of the actual conflict on appellant's representation here is clear.

**6.** The Court in *Cuyler* did not, as the majority states, impose a requirement that a defendant first show the existence of an actual conflict of interest and then show the impact of that conflict on his representation. Rather, the Court distinguished between a potential conflict of interest, which *may* affect representation, and an actual conflict of interest, which *inherently* affects representation. *Cuyler v. Sullivan*, 446 U.S. at 345, 349–50 & n.14, 100 S.Ct. at 1716, 1718–19 & n.14. The *Cuyler* court reaffirmed *Holloway's* holding that prejudice is not required, a holding which, as demonstrated above, is inconsistent with the majority's position.

*United States v. Morrison*, 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981), does not support the majority's position. First, it did not involve a multiple representation situation. The considerations which make a determination of "adverse effect" so difficult in the multiple representation area were therefore not present. Second, *Morrison* itself states that "the premise of our prior cases is that the constitutional infringement identified has had or threatens some adverse effect upon the effectiveness of counsel's representation or has produced some other prejudice to the defense." 449 U.S. at 365, 101 S.Ct. at 668. Surely, the actual conflict involved here at least "threatened" the effectiveness of appellant's representation. Finally, in *Morrison* the Court assumed that appellant's right to the effective assistance of counsel had been violated, 449 U.S. at 364,

101 S.Ct. at 667, and decided only that dismissal of the indictment was an inappropriate remedy. It did not decide that the defendant "failed to demonstrate a deprivation of her right to the effective assistance of counsel" by failing to show an effect on representation, for this was precisely the point that had been assumed. 449 U.S. at 367, 101 S.Ct. at 669.

**7.** The First Circuit, for example, has derived "two key elements necessary to establish prejudice: (1) the existence of an alternative defense strategy, and (2) the potential for conflict of interest between the defendants." *United States v. Martorano*, 620 F.2d 912, 916 (1st Cir.) (en banc), *cert. denied*, 449 U.S. 952, 101 S.Ct. 356, 66 L.Ed.2d 216 (1980). Both elements are clearly present here. An alternative strategy to pleading guilty was clearly available, namely, proceeding to a trial at which her lawyer had told her that she would be acquitted. And, again, the court below found, and the majority accepts, that an actual, not merely a potential, conflict of interest existed.

**8.** The majority's difficulties here reflect the inherent flaw in its requirement that a defendant who does identify a conflict of interest must then show the specific injury produced by that conflict. Its opinion provides a clear example of why the mandates of *Gideon* and *Holloway* must be followed. *See* note 6, *supra*.

## II. *The Rule 11 Proceeding*

As the majority implies, the trial court's procedures in accepting appellant's guilty plea did not comply with Fed.R.Crim.P. 11, which states in relevant part:

"Before accepting a plea of guilty or *nolo contendere,* the court must address the defendant personally in open court and inform him of, and *determine* that he *understands,* the following:

(1) the nature of the charge to which the plea is offered . . ."

(emphasis added). Appellant's plea, along with those of her husband and six other co-defendants, were entered in an *en masse* proceeding in which the eight defendants were addressed as a group and then asked to respond, yes or no, in turn, within a common proceeding. This shortened proceeding was even further abbreviated.

The trial judge did not trouble to explain the charge to the eight defendants before him, he merely read a fragment of the count to them, in which one of the essential elements—the commission of an overt act— was omitted. Without more ado, the trial court asked, "Any questions?" "No," said the first defendant, then the second, and so on until the name of Mrs. Laura was called. "No," she answered from her place in the crowd, no questions. There was no effort to explain, no attempt to "determine" if any defendant, as an *individual,* "understood." Indeed, when in the middle of the proceedings one of the lawyers found it inconvenient to remain, he was permitted to pass "his" defendant over to another lawyer and walk out in mid-judicial sentence. The flavor of the minutes, which the majority finds in sufficient compliance with Rule 11, may be tasted in the excerpt reproduced in the margin.[9]

9. "THE COURT: I ask each of you to listen carefully to my explanation of the substance of these counts of the indictment. In Count 1, Defendants Friedman, Ben Gonzalez, Marianne Gonzales, Diane Hudzik, Anthony Laura, Priscilla Laura and David Plotkin are charged that from on or about December 22, 1974, until on or about February 28, 1975, that you conspired together and with each other and with persons unknown to the Grand Jury to commit the following offense against the United States.

"To knowingly and intentionally import from Colombia, South America, cocaine, a Schedule II narcotics drug controlled substance in violation of Title 21, U.S.Code, Section 952, and in the indictment, there are ten overt acts set forth, which I shall not read. These overt acts are in violation of Title 21, U.S.Code, Section 963. Do any of you have any questions concerning the charges against you in Count 1?

"BY THE COURT:
"Q. Mr. Friedman?
"A. No, your Honor.
"Q. Ben Gonzalez?
"A. No, sir.
"Q. Marianne Gonzalez?
"A. No, sir.
"Q. Diane Hudzik?
"A. No, sir.
"Q. Anthony Laura?
"A. No, sir.
"Q. Priscilla Laura?
"A. No, sir.
"Q. David Plotkin?
"A. No, your Honor.

"THE COURT: Count 2 charges that on or about February 28, 1975, in this district and elsewhere, Defendants Friedman, Diane Hud-

zik, Ben Gonzalez, Marianne Gonzalez, Anthony and Priscilla Laura and David Plotkin knowingly and intentionally imported 5 kilograms of cocaine, a Schedule II narcotics drug controlled substance in violation of Title 21, U.S.Code, Section 952 and Title 18 U.S. Code, Section 2. Any questions from any of the defendants concerning Count 2?

"BY THE COURT:
"Q. Mr. Friedman?
"A. No, sir.
"Q. Diane Hudzik?
"A. No, sir.
"Q. Mr. Gonzalez?
"A. No, your Honor.
"Q. Marianne Gonzalez?
"A. No, your Honor.
"Q. Anthony Laura?
"A. No, sir.
"Q. Priscilla Laura?
"A. No, sir.
"Q. David Plotkin?
"A. No, sir.

"THE COURT: Count 3 charges Defendants Friedman, Diane Hudzik, Robert Hudzik, Anthony Laura, that from on or about February 28, 1975 and continuing thereafter, up to and including April 18, 1975, in this district and elsewhere, the defendants conspired together and with each other and with others unknown to the Grand Jury to commit the following offense against the United States:

"To knowingly and intentionally possess with the intent to distribute and distribute cocaine, a Schedule II narcotic drug controlled substance in violation of Title 81 [sic] U.S.Code, Section 841.

Whether or not a mere reading of the indictment in a conspiracy case is ever sufficient to comply with Rule 11(c)(1)'s requirements that the nature of the charge be explained to the defendant,[10] and that the court "determine" that the defendant "understands" it, it is surely clear that a reading which omits an essential element of the crime cannot suffice, and certainly not within a proceeding like this.

In *Woodward v. United States*, 426 F.2d 959, 963 (3d Cir. 1970), this Court stated that "the court must satisfy itself that the defendant understands the nature of the charge. Routine questioning or a single response by the defendant that he understands the charge are insufficient." In this case, even routine questioning, or a single response by the defendant that she understood the charge, was dispensed with. As stated in *United States v. Wetterlin*, 583 F.2d 346, 350 n.6 (7th Cir. 1978), *cert. denied*, 439 U.S. 1127, 99 S.Ct. 1044, 59 L.Ed.2d 88 (1979), "[w]hile reading the indictment may be one way of informing the defendant of the nature of the charges, . . . [it] clearly does nothing to establish on the record that appellant *understood* the nature of the charges" (emphasis in original).

The majority dismisses appellant's Rule 11 claim, as it does her Sixth Amendment claim, because it cannot find that she was prejudiced by the procedures employed. In

"In Count 3, there are set forth 13 overt acts, which I shall not read, all in violation of Title 21 U.S.Code, Section 846, and I ask the defendants whether they have any questions concerning the charges set forth in Count 3?
"BY THE COURT:
"Q. Mr. Friedman?
"A. No, sir.
"Q. Diane Hudzik?
"A. No, sir.
"Q. Robert Hudzik?
"A. No, sir.
"Q. Anthony Laura?
"A. No, sir.
"THE COURT: Count 4 charges Defendant Friedman and Defendant Anthony Laura, that on or about March 12, 1975, in this district and elsewhere, knowingly and intentionally did possess with intent to distribute approximately one pound of cocaine, a Schedule II narcotics controlled substance, in violation of Title 21, U.S.Code, Section 841, and Title 18, U.S.Code, Section 2. Any questions?
"BY THE COURT:
"Q. Mr. Friedman?
"A. No, sir.
"Q. Mr. Laura?
"A. No, sir.
"MR. DI GIACOMO: Your Honor, may I be excused? Mr. Madva has agreed to represent my client for the balance of this hearing. I have made some appointment with some lawyers from out of town.
"THE COURT: Do you agree with him, Mr. Friedman?
"MR. FRIEDMAN: Yes.
"THE COURT: You have no objection, Mr. Friedman, if Mr. Madva, who is a very competent attorney, represents you for the balance of these proceedings?
"MR. FRIEDMAN: No.
"THE COURT: Count 5 charges Defendants Friedman and Laura did intentionally possess with intent to distribute approximately 2¼ pounds of cocaine, a Schedule II narcotic controlled substance, in violation of Title 18, Section 2. Any questions concerning the charges in Count 5, Mr. Friedman?
"MR. FRIEDMAN: No, your Honor.
"MR. LAURA: No."

10. *Paradisio v. United States*, 482 F.2d 409, 414 (3d Cir. 1972), held that explaining a conspiracy charge by reading the indictment could, depending on the facts of the case, be sufficient to comply with Rule 11(c)(1). This holding is undercut by *Horsely v. United States*, 583 F.2d 670, 674 (3d Cir. 1978) (*Horsely I*), where this Court stated that "particularly where the charge is the inchoate crime of conspiracy, an explanation of the nature of the charge and the acts constituting guilt is fundamental to the achievement of justice. This is not a case of simple assault, where we might expect the defendant to have a fairly clear grasp of the nature of the crime." As *Horsely* suggests, it is highly unlikely that appellant, with no prior experience with the criminal justice system, knew that a conspiracy requires an agreement between two or more people to commit a crime, the intent to participate in an unlawful enterprise, knowledge of the existence of a conspiracy and commission of an overt act. The facts of *this* case clearly do not warrant reliance on *Paradisio*.

Several other Circuits have reached the conclusion that a mere reading of the indictment will not suffice to inform a defendant of any but the most simple charges. *Mack v. United States*, 635 F.2d 20, 25 (1st Cir. 1980); *United States v. Dayton*, 604 F.2d 931, 938 (5th Cir. 1979), *cert. denied*, 445 U.S. 904, 100 S.Ct. 1080, 63 L.Ed.2d 320 (1980); *Irizarry v. United States*, 508 F.2d 960, 965 n.4 (2d Cir. 1974) (specifically discussing conspiracy).

*United States v. Timmreck*, 441 U.S. 780, 784–85, 99 S.Ct. 2085, 2087–88, 60 L.Ed.2d 634 (1979), however, the Court concluded by stating that "we find it unnecessary to consider whether § 2255 relief would be available if a violation of Rule 11 occurred in the context of other aggravating circumstances." This case provides a clear example of such aggravating circumstances. Appellant decided to plead while being advised by a lawyer with a conflict of interest relating directly to her plea. She was told that her plea was all that stood between her husband and a greater sentence. In this situation she had a special need for the vigilance of the trial court in accepting her plea. Yet, instead, the plea was accepted through procedures in clear violation of Rule 11. Given this, *Timmreck* is inapplicable.

Aside from its misreading of *Timmreck*, the majority's discussion of the Rule 11 proceedings is unsettling. The so-called "technical" requirements of Rule 11 constitute minimal safeguards for dealing with

"perhaps the supreme instance of waiver known to our system of justice, one by which all of its trial rights and safeguards are voluntarily forgone, and the defendant deliberately submits himself to conviction." *United States v. Dayton*, 604 F.2d 931, 938 (5th Cir. 1980). There is no evidence that the trial court possessed a crowded docket which necessitated such summary procedures. Yet, instead of examining the plea with the scrutiny demanded by everything that had gone before, the trial court did not even meet the minimal requirements of Rule 11.

The acceptance of a plea conditioned on lenient treatment for another is a troublesome business.[11] Joint representation of criminal defendants, particularly where an actual conflict of interest is involved, is also troublesome. Indeed, such representation is unethical,[12] and a trial court in this Circuit may require separate counsel in such situations irrespective of the clients' wishes. *United States v. Dolan, supra.*[13] Where, as

**11.** The Supreme Court, in fact, has expressly left open the question of whether such a bargain is constitutionally permissible. *Bordenkircher v. Hayes*, 434 U.S. 357, 364 n.8, 98 S.Ct. 663, 668 n.8, 54 L.Ed.2d 604 (1978).

**12.** ABA Code of Professional Responsibility DR 5–105(c); Ethical Consideration 5–15. *See also* ABA Standards Relating to the Defense Function § 3.5.

**13.** This case provides as clear an indication as any of why the courts should adopt a simple rule—one lawyer, one client. The same United States Attorney's Office which represents appellee here has repeatedly lobbied this Court to adopt just such a rule. Except for possible savings in expense, there is no justification for joint representation. If it is in the interest of both of their clients, two lawyers may offer a "common defense [which] gives strength against a common attack," *Glasser v. United States*, 315 U.S. 60, 92, 62 S.Ct. 457, 475, 86 L.Ed. 680 (1943) (Frankfurter, J., dissenting), as easily as one. For a number of reasons, a client can never make an intelligent choice between joint and separate counsel. First, it is impossible for a defendant to obtain disinterested legal advice from the conflicted attorney, and there are few situations in which another attorney will be available to render such advice. Left to their own devices, "laymen simply are not equipped to appraise" the considerations involved. *United States ex rel. Hart v. Davenport, supra*, 478 F.2d at 203. This is true

even of the "educated" layman. *United States v. Gaines*, 529 F.2d 1038, 1044 (7th Cir. 1976). Second, even where legal advice is available, professionals are often unable to foresee the conflicts that may arise at the beginning of the proceedings, as this case amply demonstrates. *See United States v. Carrigan*, 543 F.2d 1053, 1058 (2d Cir. 1976) (Lumbard, J., concurring). Because of Fifth Amendment considerations, among others, a trial judge is often unable to explain the risks of joint representation to a client, or to determine the presence or absence of a conflict. *United States v. Dolan, supra*. Third, even when defendants are made aware of the problems engendered by joint representation, they are often reluctant to obtain separate counsel because of both the expense and uncertainty involved in selecting new counsel and the pressure of co-defendants not to break ranks, particularly where, as here, "the defendant who may benefit the most from independent counsel usually is neither the Government's principal target nor the person paying the fees." Lowenthal, *Joint Representation in Criminal Cases: A Critical Appraisal*, 64 Va.L. Rev. 939, 969 (1978). *See also United States v. Carrigan, supra*, 543 F.2d at 1058 (intelligent decision can be made only by the "rare" defendant); *United States v. Mari*, 526 F.2d 117, 121 (2d Cir. 1975), *cert. denied*, 429 U.S. 941, 97 S.Ct. 359, 50 L.Ed.2d 311 (1976) (Oakes, J., concurring) (joint representation should be per-

here, both elements are merged—where a plea agreement is entered into in order to obtain lenient treatment for a co-defendant represented by the same lawyer—the situation becomes intolerable, particularly where that lawyer has maintained his joint representation by repeatedly telling his client that no conflict could ever exist. If we are to permit conditional pleas for the benefit of another, and I think we should not, we should at a minimum require that the plea decision be made with the advice of independent counsel.

From the beginning to end there is something more than a little unwholesome about the procedures involved in this case. There is much to question in the government's demand for an "all-or-nothing" plea—in effect holding a husband hostage to his wife's waiver of her rights. Were this procedure employed in a police station to obtain a confession of guilt, we would not hesitate to ignore that confession as a result of "pressures to which, under our accusatorial system, an accused should not be subjected." *Rogers v. Richmond*, 365 U.S. 534, 541, 81 S.Ct. 735, 739, 5 L.Ed.2d 760 (1961). Yet the majority not only sanctions the use of such pressure in the courts of this Circuit, but does so in a case in which the plea was obtained in violation of Rule 11, while the defendant was denied the effective assist-

ance of counsel. From now on, in this Circuit, a judge need do nothing while a lawyer first wrongly tells his client that his representation involves no conflicts or dangers and then puts words in his client's mouth which state, falsely, that she can afford to be separately represented but desires no other attorney but him. From now on, a client who pleads guilty, advised to do so by a lawyer representing a co-defendant with a stake in inducing that plea, can find no redress here. From now on, trial courts may conduct plea proceedings *en masse*, reading only portions of the count, with lawyers in and out and requiring only that the defendant have "no questions." What is worse, from now on, trial courts may permit all this simultaneously. Today's decision not only produces an unjust result, but, I submit, it also makes extraordinarily bad law.

mitted only in "exceptional circumstances" after "the most searching inquiry in [sic] the part of the court."

Even if we disregard the impact of joint representation on an individual defendant, there are important societal interests, such as ensuring the fairness of the criminal process and protecting the finality of convictions, which are served by requiring separate counsel.